390 A.2d 350.

WILLIE LEE CALHOUN *v.* CITY OF PROVIDENCE *et al.*

AUGUST 7, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

620

KELLEHER, J.  This is a civil action, in which the plaintiff is now before us on his appeal from the grant by a Superior Court justice of the state's motion for a directed verdict. The trial justice had reserved decision on the motion, and its grant came subsequent to a jury verdict for the plaintiff in the amount of $1,200.

On Sunday, November 19, 1972, at approximately 6 p.m., plaintiff, in the company of two female friends, was driving along Cranston Street in Providence. His itinerary for the evening included dropping off one of his companions at her aunt's home, visiting a local pharmacy, and reporting to work at 7:30. However, as plaintiff leisurely directed his 1965 Chevrolet down Cranston Street and turned onto Potters Avenue, he was unaware that at that moment the Fates were conspiring against him to make November 19 a day that would be forever inscribed in his memory.

As plaintiff proceeded on his appointed rounds, he noticed the flashing lights of a Providence police cruiser reflected in his rear-view mirror. He pulled his vehicle to the side of Potters Avenue to allow the cruiser to pass, but much to his surprise, the cruiser, instead of passing him, came to a stop behind the Chevrolet. Soon a second cruiser arrived on the scene and pulled in front of his automobile. The officers who confronted him asked him for his license and registration. The plaintiff produced the documents for the officer who, after inspecting them, informed him that he was driving a

stolen car. The plaintiff told the officers that they must be mistaken because he had recently purchased the car from his employer. When one of the officers insisted that the car was "hot," plaintiff once again asserted that the car was rightfully his and that the officers were wrong.

The police then told plaintiff that they also had a warrant for his arrest that had been issued by the Warwick police. At this point plaintiff was not only dumbfounded, he was handcuffed. However, plaintiff, a firm believer that hope springs eternal, told his captors that once they arrived at the police station, they would learn that they had arrested an innocent man. He was then placed in a police van and taken to police headquarters. The supposedly stolen car was towed from the arrest site.

At headquarters plaintiff strenuously maintained that the officers had the wrong man. Nevertheless, he was placed in a cell, where he waited for several hours until the Warwick police arrived to bring him to that municipality. Once in the Warwick Police Station, plaintiff was again questioned and then put into a cell, where, needless to say, he spent a sleepless Sunday night.

On Monday morning plaintiff was brought before a justice of the Third District Court. When plaintiff was asked how he would plead to the pending charges of driving without a license and registration, he told the court that before he could plead, he wished to make an explanation.

The plaintiff then proceeded to relate that he had been in the Warwick court 8 months earlier, in March 1972, for the very same offenses, and at that time he had paid fines totalling $30 and costs. He thought that, with this payment, the matter was ended. The justice informed plaintiff that he couldn't have paid the fines because the clerk's office had no record of payment. Not so, replied plaintiff. He was sure of his position, he said, because the license and registration charges arose out of a two-car collision. The plaintiff told the court that the other party's insurer would not pay until the

charges had been resolved, and he assured the court that the insurer had paid him. At this point the District Court justice made a phone call, and at the end of this conversation he told plaintiff that he was free to leave the premises.

The plaintiff's brother came to Warwick and transported the innocent man to Providence police headquarters to retrieve his car. When plaintiff presented the release slip for the car, he was told that the vehicle was in the possession of the common carrier who had towed the Chevrolet away from Potters Avenue. When he asked who was going to pay for the towing charges, the police informed him that payment was not their responsibility. Insult was added to injury because regaining possession of his car cost plaintiff $15.

In March 1973 plaintiff, after deciding that maybe one can fight city hall and even take on the state house, commenced a civil action in the Superior Court in which he sought damages from the State of Rhode Island and the cities of Warwick and Providence. Subsequently, he discontinued his action against the two municipalities.[1]

The plaintiff's action against the state was predicated on negligence. The record reveals that in March 1972 there was a capias[2] outstanding on plaintiff issued because of the alleged unresolved motor vehicle charges. Actually, plaintiff did appear in the Third District Court in March and paid the fines imposed because of these violations. However, the capias that had been issued was never recalled by the state. The plaintiff's claim against the state is based upon its failure to recall the capias.

At trial the state offered no evidence. In ordering the directed verdict, the trial justice ruled that the cancellation

---

[1] The complaint against Warwick and Providence alleged as grounds for recovery slander, false arrest, false imprisonment, and conversion.

[2] At common law a capias was a writ directing the sheriff to arrest a defendant and bring the defendant before the court to answer the charge set forth in the writ. *Fields* v. *Ragelmeir*, 19 Ohio Dec. 164, 7 Ohio N.P. 585 (1908).

of the capias involved the performance of a judicial act that could only be performed by a judge having the requisite jurisdiction. Thus, the trial justice reasoned that although the judge who failed to recall the capias may have been negligent, he was immune from personal liability by reason of the doctrine of judicial immunity. The trial justice went on to rule that since the basis for the state's liability rested on the principle of *respondeat superior*, it followed that, if the allegedly negligent servant was immune from liability, the state must also be immune. He also observed that this result was called for even though G.L. 1956 (1969 Reenactment) §9-31-1 renders the state liable in tort for damages up to the amount of $50,000.

While plaintiff's appeal is based on several contentions, the decisive issues are (1) whether the enactment of §9-31-1 has abolished all vestiges of the doctrine of sovereign immunity and (2) if the doctrine retains some viability, does it provide a sufficient basis for the grant of the directed verdict.

The plaintiff, in challenging the trial justice's grant of the directed verdict, claims that the trial justice completely confused the doctrines of sovereign and judicial immunity. According to plaintiff, even if one assumes that cancellation of the capias was a judicial act and the negligent state employee would be personally immune from suit because of judicial immunity, it does not inexorably follow that the state is thereby relieved from financial responsibility. He points out that the doctrine of judicial immunity only arises when the state agent is *personally* made a party to the action and not when the state is the defendant. When the action is against the state, plaintiff maintains that recovery should be allowed under §9-31-1 regardless of whether the offending employee is personally immune for his conduct.

In its pertinent part §9-31-1 reads as follows:

"The state of Rhode Island and any political subdivision thereof, including all cities and towns, shall

* * * hereby be liable in all actions of tort in the same manner as a private individual or corporation * * *."

There can be no questioning the fact that the General Assembly, in enacting §9-31-1, has sharply reduced the broad notion of sovereign immunity[3] that had prevailed in this jurisdiction. However, we do not believe that the Legislature ever intended the statute to operate so as to impose liability upon the state for any and all acts or omissions of its employees and officers which might cause injury to persons.

Section 9-31-1 can only be fully understood in light of the historical development and demise of the doctrine of sovereign immunity. Legal scholars are in general agreement that governmental immunity had its genesis in the English case of *Russell* v. *Men of Devon,* 2 T.R. 667, 100 Eng. Rep. 359 (1788). *See* Borchard, *Government Liability in Tort,* 34 Yale L.J. 1 (1924). In *Russell* the court upheld a claim of immunity against a poitical subdivision upon the fear that "an infinity of actions" would arise and that "it is better that an individual should sustain an injury than that the public should suffer an inconvenience." 2 T.R. at 671, 673, 100 Eng. Rep. at 362. Underlying these expressions was presumably the English notion, based upon centuries of monarchial rule, that the King could do no wrong. *Molitor* v. *Kaneland Community Unit District No. 302,* 18 Ill. 2d 11, 163 N.E.2d 89 (1959). From this concept evolved doctrines exempting governmental units from vicarious tort liability because the ruling authority of the commonwealth could not as principal

---

[3]Prior to the General Assembly's passage of G.L. 1956 (1969 Reenactment) §9-31-1, this court eliminated sovereign immunity as it applied to municipal and quasi-municipal corporations, *Becker* v. *Beaudoin,* 106 R.I. 562, 261 A.2d 896 (1970), and invited legislative action in this area. The Legislature responded by enacting ch. 31 of title 9, which, in its pertinent part, makes the state and municipalities liable in tort in an amount not to exceed $50,000. The Legislature also specified that special acts could be passed whereby a city or town could be sued for damages in an amount exceeding $50,000. In *Beaudoin* we did not have the occasion to reach the issue raised by the plaintiff in this case.

be held to account, either personally or under the concept of *respondeat superior*, for the negligent acts of his servants. Jaffe, *Suits Against Governments and Officers: Damage Actions*, 77 Harv. L. Rev. 209 (1963).

The doctrine of governmental tort immunity was imported to the United States in the early part of the 19th century with *Russell* being relied upon to deny tort recovery against state and municipal governments. *See Mower* v. *Leicester*, 9 Mass. 247 (1812). Rhode Island recognized the doctrine as it applied to municipal corporations in *Wixon* v. *City of Newport*, 13 R.I. 454 (1881). There the court held that a municipality was immune for either the nonperformance or the negligent performance of its employees and officers while they were engaged in the exercise of a governmental function. This latter function was defined as "a matter in which it [the municipality] has no private or corporate interest." 13 R.I. at 458-59

The rule stated in *Wixon* was first applied in *Kelley* v. *Cook*, 21 R.I. 29, 41 A. 571 (1898). There a Woonsocket police officer arrested the plaintiff's decedent without meeting the requirements of law and brought him to the city jail. While confined, the individual became ill and subsequently died as a consequence of his illness. The administrator of the decedent's estate brought an action against the city on the grounds that the decedent had been wrongfully arrested and that city employees had been negligent in caring for him while he was in custody. This court sustained the city's demurrer to the complaint. With regard to the issue of the illegal arrest, the court held that the city could not be liable for the conduct of the arresting officer because, in appointing him, city officials were merely exercising a governmental function and, therefore, the city was immune from suit. The same reasoning was employed by the court in disposing of the claim of negligence in the care of the decedent.

*Kelley* exemplifies in part the strained reasoning which is manifest in many decisions here and in other jurisdictions,

where the courts have attempted either to apply or to circumvent the doctrine of governmental immunity. The fragmentation of governmental functions into proprietary and governmental activities with liability depending upon which label was chosen for a particular activity led at worst to innumerable injustices and at best to a plethora of legislative and judicial exemptions.

Although governmental tort immunity was adopted in the majority of jurisdictions, since the 1950's there has been a gradual chipping away of the impenetrable barrier which it once presented. About the midpoint of the 20th century there came a recognition that this doctrine could no longer be justified on the basis of "an amorphous mass of cumbrous language about sovereignty * * *." Leflar and Kantrowitz, *Tort Liability of the States*, 29 N.Y.U. L. Rev. 1363, 1364 (1954). Courts and legislatures began to appreciate that a doctrine founded upon medieval absolutism was an incongruity in a society that professed to provide a system by which one could seek redress from wrongs against him. *Molitor* v. *Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 163 N.E.2d 89 (1959). *Barker* v. *City of Santa Fe*, 47 N.M. 85, 136 P.2d 480 (1943).

Among the first cases abrogating the doctrine was *Muskopf* v. *Corning Hospital District*, 55 Cal. 2d 211, 359 P.2d 457, 11 Cal. Rptr. 89 (1961). Writing for the court, Mr. Justice Traynor said, in abolishing the doctrine in California:

> "The rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia. * * * None of the reasons for its continuance can withstand analysis." 55 Cal. 2d at 216, 359 P.2d at 460, 11 Cal. Rptr. at 92.

However, although convinced that sovereign immunity had no place in American jurisprudence, Justice Traynor was equally sure that public policy mandated that some vestige of the immunity be retained. For example, he considered basic

policy decisions of government within constitutional limitations nontortious and, therefore, protected against claims for damages. Furthermore, abrogation of governmental immunity did not affect the well-settled rules of immunity of government officials for conduct within the scope of their authority. In the companion case of *Lipman* v. *Brisbane Elementary School District*, 55 Cal. 2d 224, 359 P.2d 465, 11 Cal. Rptr. 97 (1961), the court held that the personal immunity of governmental officials may also inure to the benefit of the state when the tort action was commenced against the governmental unit rather than the personally immune official.

State after state abolished sovereign immunity during the sixties and seventies, until at present the doctrine exists in only a handful of jurisdictions. *See* Restatement (Second) *Torts* §895A at 12-20 (Tentative Draft, March 30, 1973). Nevertheless, in line with *Muskopf* and *Lipman*, there has been a decided reluctance in all jurisdictions that have considered the question to impose liability upon the state for certain activities conducted by its agents and servants. The rationale for this hesitancy is not difficult to discern. As Professor Prosser has observed, some remnant of governmental immunity must be retained to insure effective government. It would be unthinkable, for example, to hold the state liable for a wrong decision of its courts or the implementation of a particular state program. Prosser, *Law of Torts* §131 at 986 (4th ed. 1971). The disruptive effect such a result would have upon our branches of government needs no elaboration. However, unlike the common law doctrine of sovereign immunity which operated as a bar to recovery regardless of whether countervailing policies were implicated, current limitations upon governmental liability proceed from considerations of competing interests. There must be a weighing of the injured party's demand for justice against the state's equally valid claim to exercise certain powers for the good of all without burdensome encumbrances and disruptive forces. *Lipman* v. *Brisbane Elementary School District*, 55 Cal. 2d 224, 359 P.2d 465, 11 Cal. Rptr. 97 (1961).

Recognition that there is a zone of governmental operation which should be insulated from tort claims, even in the absence of sovereign immunity, has been accomplished either by legislative or judicial fiat. *See* Alaska Stat. §09.50.250; 1976 Haw. Rev. Stat. §662-15; *Campbell* v. *State*, 259 Ind. 55, 284 N.E.2d 733 (1972); *State ex rel. Department of Justice* v. *District Court of the Eighth Judicial District*, 172 Mont. 88, 560 P.2d 1328 (1976); *Willis* v. *Department of Conservation & Econ. Dev.* 55 N.J. 534, 264 A.2d 34 (1970); *Weiss* v. *Fote*, 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960); *Evangelical United Brethren Church of Adna* v. *State*, 67 Wash. 2d 246, 407 P.2d 440 (1966). Although these jurisdictions vary somewhat in their formulations of the extent of the limitation upon state tort liability and in their rationale for adopting such a position, their message is clear and unanimous — reasoned judgment demands that certain government enterprises engaged in by employees and officers must be free from the threat of potential litigation. The plaintiff has not directed our attention to a single jurisdiction, nor have we uncovered one, which has subscribed to a different rule.

We are mindful that our statute, §9-31-1, does not contain an explicit restriction upon the state's tort liability. Our preceding discussion should make it clear, however, that abolition of the doctrine of sovereign immunity has never been understood as completely subjecting every and all governmental functions to court action. It is within this framework that the General Assembly enacted §9-31-1. We will not attribute to the Legislature the intent to wipe away all barriers to state liability and thereby radically depart from established conceptions of state tort responsibility without a clear statement regarding such a change. *Knowles* v. *Ponton*, 96 R.I. 156, 190 A.2d 4 (1963).[4]

---

[4]In *S.S. Kresge Co.* v. *Bouchard*, 111 R.I. 685, 306 A.2d 179 (1973), we also took a restrictive view of §9-31-1 by excluding from its terms claims arising out of the allegedly illegal assessment of taxes. Despite the absence of language in §9-31-1 indicating that such claims were barred by a civil action, we felt that the General Assembly had already provided relief from illegal assessments in G.L. 1956 (1970 Reenactment) §44-5-26.

Our holding on this phase of plaintiff's appeal finds support in the decisions of other courts construing their sovereign immunity waiver statutes which are similar to our own. In two of the cases, the contention that the state was liable for all activities of its employees and officers without restriction was dismissed almost out of hand. *State ex rel. Department of Justice* v. *District Court of the Eighth Judicial District,* 172 Mont. 88, 560 P.2d 1328 (1976); *Weiss* v. *Fote,* 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960). Apparently, the concept of absolute liability for all governmental conduct was thought to be too preposterous to require extensive analysis. The third state, Washington, reached the result by defining certain government activity as nontortious and, therefore, not actionable under the statute. *Evangelical United Brethren Church of Adna* v. *State,* 67 Wash. 2d 246, 407 P.2d 440 (1966). In essence, these courts, and our own decision on this matter, simply interpret the particular statute within what is perceived to be the bounds intended by their respective legislative bodies.

The demarcation point between state activities that are actionable and those which are not has primarily been drawn with reference to the personal immunities of government officials, e.g., judicial, prosecutorial, and legislative immunities. *Board of Commissioners* v. *Briggs,* 167 Ind. App. 96, 337 N.E.2d 852 (1975); *King* v. *City of Seattle,* 84 Wash. 2d 239, 525 P.2d 228 (1974); *State ex rel. Department of Justice* v. *District Court of the Eighth Judicial District,* 172 Mont. 88, 560 P.2d 1328 (1976).[5] This result has been achieved by several courts by strictly applying the doctrine of *respondeat superior* — if the agent is not liable for his conduct, the principal cannot be responsible. *Board of Commissioners* v. *Briggs,* 167 Ind. App. 96, 337 N.E.2d 852 (1975). How-

---

[5]Some courts express the limitation upon state tort liability in terms of the discretionary acts of state officials. *See Weiss* v. *Fote,* 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960). It has been pointed out, however, that use of the phrase "discretionary acts" is merely a reference to the generally established requirements for personal governmental immunity protection. *Board of Commissioners* v. *Briggs,* 167 Ind. App. 96, 337 N.E.2d 852 (1975).

ever, we do not believe that strict application of *respondeat superior* principles marks the best approach to the question.

If, as we have found, there are certain governmental functions which cannot be the subject of tort claims, the reason for their exempt status must be because important societal interests are at stake. *Lipman* v. *Brisbane Elementary School District,* 55 Cal. 2d 224, 359 P.2d 465, 11 Cal. Rptr. 97 (1961). Such interests are found in the public policies supporting the various governmental immunities.

Certain types of activities, as for example judicial decision-making and the enforcement of the criminal laws by the attorney general, must be engaged in by these officials freely, independently, and untrammeled by the possibilities of personal liability. *Suitor* v. *Nugent,* 98 R.I. 56, 199 A.2d 722 (1964). As the court observed in *Pierson* v. *Ray,* 386 U.S. 547, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967), when speaking of judicial immunity:

> "[The immunity] 'is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences.' (citations omitted) It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation." 386 U.S. at 554, 87 S. Ct. at 1218, 18 L. Ed. 2d at 294-95.

Such judicial independence is at the very core of our judicial system, and courts have guarded it jealously. *See Stump* v. *Sparkman,* 435 U.S. 349, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978).

While immunizing officials from personal liability is, of course, a separate concept from governmental immunity, *Muskopf* v. *Corning Hospital District*, 55 Cal. 2d 211, 359 P.2d 457, 11 Cal. Rptr. 89 (1961); *Lister* v. *Board of Regents*, 72 Wis. 2d 282, 240 N.W.2d 610 (1976), substantial public policies necessitate that even when the state is the defendant, recovery should be denied the injured party. If a judge must weigh each decision against the possibility that he will precipitate tort litigation against the state, his judicial freedom and independence are, nevertheless, affected. The same is true with regard to the conduct of other immune officials whose freedom from liability in particular cases is premised upon compelling public policy grounds. *State ex rel. Department of Justice* v. *District Court of the Eighth Judicial District*, 172 Mont. 88, 560 P.2d 1328 (1976); *Litchner* v. *State*, 82 Misc. 2d 858, 371 N.Y.S.2d 858 (Ct. Cl. 1975); *Creelman* v. *Svenning*, 67 Wash. 2d 882, 410 P.2d 606 (1966).

We, therefore, find in this case, as did the trial justice, that plaintiff's claim is barred if the state official responsible for canceling the capias personally enjoyed the protection of a governmental immunity from tort liability.

As we noted earlier in this decision, plaintiff's complaint against the state alleged that as a consequence of a state employee's negligence, he was arrested pursuant to a capias which was no longer valid. The plaintiff did not, however, attempt to show the particular negligent act which was the proximate cause of his predicament nor who on the state's payroll was remiss in his duties. Instead, he maintained that his case presented a *res ipsa loquitur* situation with the burden on the state to demonstrate its freedom from culpability.

Despite the state's protestations to the contrary, the evidence introduced by plaintiff clearly established a prima facie case of negligence. *Marshall* v. *Tomaselli*, 118 R.I. 190, 372 A.2d 1280 (1977). Since we are concerned

here with a grant of defendant's motion for a directed verdict, we must view the evidence presented at trial, without considering such factors as weight or credibility, in the light most favorable to plaintiff, and extract from the record only those reasonable inferences which support the position espoused by plaintiff. *Evans* v. *Liguori*, 118 R.I. 389, 374 A.2d 774 (1977). In so viewing the evidence, there is no question that the record reasonably supports the inference that plaintiff's arrest, the loss of his car, and his overnight incarceration all came about because somebody in the employ of the state "goofed."

Throughout this litigation the state has attempted to excuse its negligence by insisting that it was the judge's failure to recall the capias which caused plaintiff's difficulties. Early on in this suit the state filed a motion to dismiss plaintiff's complaint because it failed to state a claim upon which relief could be granted. In a memorandum supporting its motion, the state referred to the doctrine of judicial immunity and asserted that "courts cannot be held liable for their errors." At no time, either before or at trial, did the state ever make any effort to support this contention by proving that it was the fault of a judge in failing to recall the capias which led to plaintiff's November 19, 1972 travails. This evidentiary lapse by the state is fatal to its cause.

The state, by relying on the doctrine of judicial immunity, assumed the burden of persuasion that could be discharged either by way of a motion to dismiss or by filing an affirmative defense. It is clear that the state, in asserting a defense which was subject to proof, never came close to discharging its burden. *See Raffety* v. *Prince George's County*, 423 F. Supp. 1045 (D. Md. 1976).

The evidentiary state of the record is such that when the state moved for a directed verdict, the jury was well warranted in finding that the lapse which led to this suit occurred in the clerk's office where, because of some bookkeeping slip-up, either the issuance of the capias was never docketed

or the recall order was never entered. The clerk, unlike the judge, is not immune to suit because of his failure to perform the ministerial functions imposed upon him by law. *Mc-Lallen* v. *Henderson,* 492 F.2d 1298 (8th Cir. 1974); *Touchton* v. *Echols County,* 211 Ga. 85, 84 S.E.2d 81 (1954); *Maddox* v. *Astro Investments,* 45 Ohio App. 2d 203, 343 N.E.2d 133 (1975); *Charco, Inc.* v. *Cohn,* 242 Ore. 566, 411 P.2d 264 (1966).

The plaintiff's appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court with direction to enter judgment for the plaintiff in accordance with the jury's verdict.

*Pucci & Goldin, Inc., Samuel A. Olevson,* for plaintiff.

*Julius C. Michaelson,* Attorney General, *William Granfield Brody,* Special Assistant Attorney General, for defendants.