**Mark F. BARRATT et al.**

v.

**Doris BURLINGHAM et al.**

No. 82–359–Appeal.

Supreme Court of Rhode Island.

May 23, 1985.

by employee.

---

1. Because our resolution of this issue is dispositive, we need not address the other issues raised

**1220**

Mark S. Mandell & Jay Goodman, Mandell, Goodman and Schwartz, Providence, for plaintiffs.

John R. Mahoney, Carroll, Kelly & Murphy, Providence, for defendants.

1. Doris Burlingham, the town treasurer, was the named defendant because a suit against the town treasurer is in substance and legal effect a

OPINION

SHEA, Justice.

This is a civil action brought by Mark F. Barratt (Barratt) and his parents, William J. and Bernadette Barratt, against Peter Magnant, a North Kingstown special police officer; Michael J. Burke, a North Kingstown police officer; and the town of North Kingstown.[1] The case comes before us on the plaintiffs' appeal from a judgment of the Superior Court granting the defendants' motion for summary judgment pursuant to Rule 56 of the Superior Court Rules of Civil Procedure. The plaintiffs contend that the judge below erred in granting that motion. We affirm.

■ Initially, we note that in reviewing the grant of a motion for summary judgment, this court applies the same rules as the trial court. *Ardente v. Horan,* 117 R.I. 254, 257, 366 A.2d 162, 164 (1976). This review includes an examination of the pleadings and affidavits viewed in a light most favorable to the party opposing the motion. *Steinberg v. State,* — R.I. —, —, 427 A.2d 338, 340 (1981). Only when our review reveals no issues of material fact, and the moving party is entitled to judgment as a matter of law, will we uphold the trial justice's order granting summary judgment. *Id.*

The following facts are undisputed. On the evening of May 27, 1978, Barratt, a seventeen-year-old, and two friends, Roger McMurray and Charles Bonn, went to the Carriage Inn, a restaurant and bar in North Kingstown. By the time they left the Carriage Inn at 1 a.m. on May 28, they were quite intoxicated, each having consumed seven or eight drinks.

As the three young men started to leave the Carriage Inn's parking lot in a car driven by McMurray, a special police officer on duty in the parking lot that night, Peter Magnant, stopped the car and ordered McMurray to park it in a vacant lot

suit against the town pursuant to G.L.1956 (1980 Reenactment) § 45-15-5.

across the street. Magnant told them that they were going to stay parked until they sobered up. McMurray told the officer that he did not want any trouble and that they only wanted to be on their way. At this point Barratt asked Magnant if he could talk with him. He got out of the car and told the officer that he was "straighter" than his friends. Attempting to show that he was sober, Barratt offered to do pushups and jumping jacks, but Magnant replied that it would not be necessary. Magnant asked to see Barratt's driver's license, but Barratt told him he did not have it on his person. In fact, Barratt was not licensed to drive by the State of Rhode Island or any other state. · When Magnant asked Barratt in what direction he was going, Barratt told him that they were heading south. The officer then gave Barratt permission to drive and told him to leave the area.

Barratt then drove McMurray's car from the vicinity of the Carriage Inn to the Warwick·exit off route 95, where he stopped the car and relieved himself. At this point, McMurray took over as driver and drove the trio to the Seawall in Warwick, Rhode Island, where they met some friends and drank some beer. Approximately half an hour later, McMurray dropped Barratt and Bonn at Barratt's home so that they could get cigarettes. Finding none, Barratt and Bonn left the house and found that McMurray had returned and was waiting for them in the car. McMurray then drove them to a self-service station where they got cigarettes. Thereafter, Bonn took over the driving. While on Oakland Beach Avenue in the city of Warwick, the car transporting the three young men collided with a utility pole and a tree. Barratt was seriously injured as a result of the accident and remains a quadriplegic.

Barratt contends that defendant Magnant voluntarily assumed a duty toward him when he stopped the car and announced that he would not allow them to leave until they "sobered up." Magnant's conduct, Barratt argues, engendered a per-

sonal duty to act reasonably to protect Barratt and his friends from the obvious, real, and severe danger of driving while intoxicated. In short, Barratt argues that the circumstances of this case—Magnant's personal intervention and contact with Barratt and his friends—transformed Magnant's duty as a police officer from a duty to protect the general public into a duty owed to Barratt individually. We cannot agree.

This court's decision in *Becker v. Beaudoin*, 106 R.I. 562, 261 A.2d 896 (1970), abrogated the judicially created doctrine of sovereign immunity as a defense to tort claims against municipal and quasi-municipal corporations. Shortly after the holding in *Becker*, the Legislature enacted G.L. 1956 (1969 Reenactment) § 9–31–1, as enacted by P.L. 1970, ch. 181, § 2, which abrogated the sovereign immunity of the state as well as of all other political subdivisions in Rhode Island.

Section 9–31–1, however, was not intended "to operate so as to impose liability upon the state for any and all acts or omissions of its employees and officers which might cause injury to persons." *Calhoun v. City of Providence*, 120 R.I. 619, 625, 390 A.2d 350, 353 (1978). It was understood that "[t]here must be a weighing of the injured party's demand for justice against the state's equally valid claim to exercise certain powers for the good of all without burdensome encumbrances and disruptive forces." *Id.* at 628, 390 A.2d at 355.

Recognizing that certain government activities engaged in by employees and officers must be free of the threat of potential litigation, this court concluded that before such liability could be imposed upon the state, "plaintiffs must show a breach of some duty owed them in their individual capacities and not merely a breach of some obligation owed the general public." *Ryan v. State Department of Transportation*, —— R.I. ——, ——, 420 A.2d 841, 843 (1980); *see also Orzechowski v. State*, —— R.I. ——,

——, 485 A.2d 545, 548 (1984); *Smith v. Tripp*, 13 R.I. 152, 154 (1880).

■ In the instant case, when the police officer allowed Barratt to drive, his act was an exercise of discretion coming within the scope of his authority to enforce the criminal-drunk-driving laws pursuant to G.L. 1956 (1982 Reenactment) § 31–27–2. Section 31–27–2, which makes driving under the influence of liquor unlawful, is intended to protect the general public from intoxicated drivers. Since the duty imposed by that statute upon police officers charged with enforcing it is public in nature, Magnant's duty to Barratt was public in nature.

■ Contrary to Barratt's contention, Magnant's personal intervention and contact with Barratt and his friends created no special duty owed to him in an individual capacity. A police officer's observation of a citizen's conduct that might foreseeably create a risk of harm to others, or the officer's temporary detention of the citizen is not sufficient in itself to create a "special relationship" that imposes on the officer such a special duty. *Jackson v. Clements*, 146 Cal.App.3d 983, 987, 194 Cal.Rptr. 553, 555 (1983). If we were to hold otherwise, officers trying to avoid liability might be compelled to remove from the road all persons who pose any potential hazard and, in doing so, might find themselves subject, in many instances, to charges of false arrest. *Shore v. Town of Stonington*, 187 Conn. 147, 157, 444 A.2d 1379, 1384 (1982). "We do not think that the public interest is served by allowing a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a policeman's discretionary duty. Such discretion is no discretion at all." *Id.* We conclude, therefore, that Magnant is not personally liable to plaintiffs on these facts.

■ Negligence is the breach of a duty, the existence of which duty is a question of law. *Federal Express Corporation v. State of Rhode Island Department of Transportation*, 664 F.2d 830, 835 (1st Cir. 1981). If no such duty exists, then the trier of fact has nothing to consider and a motion for summary judgment must be granted. Accordingly, since we find no duty was owed to Barratt in his individual capacity, granting the motion for summary judgment by the trial justice was appropriate.

For these reasons, the plaintiffs' appeal is denied and dismissed. The judgment appealed from is affirmed, and the papers of this case are remanded to the Superior Court.

KELLEHER, Justice, concurring.

While I agree with my Brother Shea that the police and the town of North Kingstown are not properly chargeable with liability for this tragedy, I reach this conclusion via a somewhat different route than he has taken. In doing so, I express great doubt concerning the development, application, and viability of the public-duty doctrine in Rhode Island.

By enacting G.L. 1956 (1969 Reenactment) § 9–31–1, as enacted by P.L. 1970, ch. 181, § 2, the Rhode Island Legislature abrogated the doctrine of sovereign immunity and held the state and its political subdivisions "liable in all actions of tort in the same manner as a private individual or corporation * * *." In *Ryan v. State of Rhode Island Department of Transportation*, —— R.I. ——, ——, 420 A.2d 841, 843 (1980), we determined that this statute did not absolve plaintiffs in negligence actions brought against the state from demonstrating "some duty owed them in their individual capacities and not merely a breach of some obligation owed the general public." Accordingly, in that case we held the state harmless where the plaintiffs alleged that the negligence of the State Registrar of Motor Vehicles, in licensing a driver with a lengthy record of motor-vehicle violations, caused the accident from which their injuries resulted.

We similarly denied relief to the plaintiff in *Saunders v. State*, —— R.I. ——, 446 A.2d 748 (1982). There, the mother of a prisoner murdered by his fellow inmates brought a

wrongful-death action against the State of Rhode Island and the warden of the Adult Correctional Institutions. We held that liability would accrue only where "prison officials should have had notice * * * that these dangerous propensities [of the attacker] would be likely to give rise to an attack upon plaintiff's decedent as a specific identifiable victim or as a member of a group of identifiable victims." *Id.* at —, 446 A.2d at 751.

Finally, most recently in *Orzechowski v. State*, — R.I. —, 485 A.2d 545 (1984), we further outlined the parameters of the doctrine when we found that no special duty existed between the Rhode Island Parole Board and the victim of a negligently paroled prisoner. We held:

"[T]his duty runs to the public as a whole, and not to any particular individual or class of individuals—*unless special circumstances are involved that bring the plaintiff specifically into the realm of the parole board's knowledge.*" (Emphasis added.) *Id.* at —, 485 A.2d at 549.

When Officer Magnant pulled Barratt and his companions over to the side of the road outside the Carriage Inn at 1 a.m. on May 28, I am convinced that the special circumstances absent in *Ryan, Saunders,* and *Orzechowski,* and necessary to establish a special duty, were created.

Viewing the evidence and the inferences therefrom in the light most favorable to Barratt, he and his two companions were obviously intoxicated when they first encountered Officer Magnant.[2] The officer spent approximately fifteen minutes with the trio, during which time he observed them and concluded they were not capable of driving without sobering up. Magnant clearly appreciated the danger the three

represented to both themselves and other automobile drivers since he forbade them from continuing on until they could do so safely. The evidence indicates that he eventually allowed Barratt to drive, not because he believed Barratt to be sober, but because Magnant—who had temporarily forsaken his traffic-control responsibilities to attend to Barratt and his drinking and traveling companions—decided it was time to untangle the traffic jam that had been created. Bonn testified that the closing-time scene was lively and confusing with "so many people * * * beeping the horn[s] and trying to get out of the parking lot. He [Magnant] was in a hurry to get back over there to his thing, the flashlight." In giving Barratt "permission" to drive, Magnant told him, "[G]et the hell out of here."

I am persuaded that these events sufficed to bring Barratt "specifically into the realm of [Magnant's] knowledge," as required by *Orzechowski.* Magnant's duty at that point was quite specifically directed to Barratt and his companions and not to some amorphous, unknown "public." This was hardly the situation referred to in *Shore v. Town of Stonington,* 187 Conn. 147, 157, 444 A.2d 1379, 1384 (1982), as one where "some kind of harm may happen to someone." Here, in contrast to the situation in *Orzechowski,* the evidence, viewed in a light most favorable to Barratt, indicates that "defendant[s] knew or reasonably should have known of a threat to the specific plaintiff." — R.I. at —, 485 A.2d at 549. Magnant's obligation at this point was to "take reasonable steps to prevent [the injury]." *Id.* at —, 485 A.2d at 548.

I would, however, agree with the trial judge's disposition of this case on the

---

**2.** Descriptions of the events of the evening are recounted in the depositions of Barratt, McMurray, and Bonn. Magnant, in his deposition, disclaims any recollection of either that night or the incident, including whether or not he worked. He stated under oath:

"I do not remember the incident [stopping McMurray's car], or [that] I worked that partic-

ular time, but I was told that I was on duty at the time, that date." He did, however, recall that someone was checking identifications at the door of the Carriage Inn on the specific night of the accident, the name of that person, and that they chatted that night.

grounds that as a matter of law, Magnant's responsibility for Barratt's conduct ended when Barratt arrived at his home. Magnant cannot then be held accountable for the youths' further forays that morning. It would be absurd to suggest that the duty Magnant undertook to Barratt that morning extended to the following afternoon or week or month. It would be just as absurd, on the basis of these facts, to extend it beyond the point at which Barratt arrived home safely.

Two of the three young men in McMurray's car that night testified that they had informed Magnant they were on their way home. Barratt stated, "I told him [Magnant] we weren't looking for no trouble, we just wanted to leave to go home." Similarly, Bonn indicated that when Magnant asked the trio where they were from, they told him "from Warwick. We just wanted to go back there." Bonn was also asked at his deposition where he and his companions actually intended to go when they left the Carriage Inn with Magnant's imprimatur. He responded, "We were going back home." Once Barratt did, in fact, reach this professed destination, whatever duty Magnant had undertaken ended.

I am satisfied that the situation would be no different if Magnant had escorted Barratt home, only for Barratt to again leave in search of further recreation. While the reasonableness of Magnant's actions in letting an intoxicated teenager drive himself home as opposed to escorting him home is open to question, the operative fact remains the same: Barratt reached home safely. Intentionally or not, Magnant's duty was satisfactorily discharged at this time.

Barratt's counsel has earnestly suggested that we follow the recent trend of other state courts and abandon the public-duty doctrine. *Adams v. State*, 555 P.2d 235, 241–42 (Alaska 1976); *Ryan v. State*, 134 Ariz. 308, 310, 656 P.2d 597, 599 (1982); *Martinez v. City of Lakewood*, 655 P.2d 1388, 1390 (Colo.Ct.App.1982); *Schear v. Board of County Commissioners of the County of Bernalillo*, 101 N.M. 671, 687 P.2d 728, 731 (1984). In *Orzechowski* we acknowledged "some criticism of the judicially fashioned distinction between a duty owed the public in general and a duty owed to individual members of the public." —— R.I. at ——, 485 A.2d at 549 n. 3. We maintained, however, that this distinction is "crucial; to hold otherwise would result in [the state's] exposure to liability for practically every action taken in the governance of its citizens." *Id.* Closely allied to this "opening the floodgates" argument is the idea that the state's treasuries would be severely depleted by these claims. One other argument generally advanced in support of the doctrine is the need to prevent hindrance of the governing process. In this case, the latter argument translates into the majority's concern that "if we were to hold otherwise, officers trying to avoid liability might be compelled to remove from the road all persons who pose any potential hazard and, in doing so, might find themselves subject, in many instances, to charges of false arrest." Relying on the experience of other states that have abolished the public-duty doctrine, I have begun to doubt the validity of these arguments, and write at this time to encourage a reexamination of a rule of law that increasingly "results in a duty to none where there is a duty to all." *Schear*, 687 P.2d at 731.

In a thorough and well-reasoned concurring opinion, Justice Utter of the Washington Supreme Court rejected the public-duty doctrine as "in reality merely a not so subtle and limited form of sovereign immunity," which had been abolished by the Washington Legislature. *Chambers-Castanes v. King County*, 100 Wash.2d 275, 291, 669 P.2d 451, 461 (1983). In *Martinez v. City of Lakewood*, 655 P.2d at 1390, the court recognized the doctrine as "a function of municipal sovereign immunity and not a traditional negligence concept which has a meaning apart from the governmental setting. * * * [I]ts efficacy is dependent on the continuing vitality of the doc-

trine of sovereign immunity" (quoting *Commercial Carrier Corp. v. Indian River County*, 371 So.2d 1010 (Fla.1979)). Given the broad language of Rhode Island's statute interring the doctrine of sovereign immunity,[3] I question the propriety of its judicial resurrection in the guise of the public-duty doctrine.

I believe that both the floodgates argument and the over-taxed-treasury argument have been substantially addressed by the Legislature—the former through § 9–31–1 and the latter through the statutory limitation on monetary damages found in § 9–31–2.[4] Through these two statutes, the Legislature has clearly and knowingly opened the door for increased litigation while protecting the state's treasury against excessive claims.

In addition, abandonment of the public-duty doctrine would not mean abandonment of the traditional tort concepts of foreseeability, breach of duty, and proximate cause. If indeed there are floodwaters awaiting release here, these elements of a negligence action would substantially stem the torrent of cases. *Schear*, 687 P.2d at 733; *Chambers-Castanes*, 100 Wash.2d at 294, 669 P.2d at 461. I would also point out, as did Justice Utter in *Chambers-Castanes*, that "governmental entities have the same option as private parties of spreading their losses through insurance." *Id.* at 292, 669 P.2d at 461.

Finally, I would suggest that in abrogating the doctrine of sovereign immunity, the Legislature necessarily rejected the argument that state liability would result in governmental collapse. Under a system without a public-duty doctrine, not *all* the actions of public officials would be subject to judicial scrutiny and potential liability, only those performed negligently. Where the state is not liable for the negligence of its officers, what possible incentive exists for the exercise of due care in the carrying out of governmental functions? I am persuaded by the New Jersey court that stated:

"We think that a sound public policy requires that public officers and employees shall be held accountable for their negligent acts in the performance of their official duties to those who suffer injury by reason of their misconduct. Public office or employment should not be made a shield to protect careless public officials from the consequences of their misfeasances in the performance of their public duties." *Florio v. Schmolze*, 101 N.J.L. 535, 542, 129 A. 470, 472–73 (1925) (quoted in *Ryan*, 134 Ariz. at 309, 656 P.2d at 598).

In contravention to the predictions of catastrophe surely accompanying abandonment of the public-duty doctrine, we have the testimony of the Arizona Supreme Court after similarly casting it aside: "Arizona survived!" *Ryan v. State*, 134 Ariz. at 309, 656 P.2d at 598.

Accordingly, I would affirm the decision of the trial justice while casting a wary eye on the public-duty doctrine because I fear its continued application could well nullify

---

3. General Laws 1956 (1969 Reenactment) § 9–31–1, as enacted by P.L. 1970, ch. 181, § 2, provides: **"Tort liability of state.**— The state of Rhode Island and any political subdivision thereof, including all cities and towns, shall, subject to the period of limitations set forth in § 9–1–25, hereby be liable in all actions of tort in the same manner as a private individual or corporation, provided however, that any recovery in any such action shall not exceed the monetary limitations thereof set forth in the chapter."

4. Section 9–31–2 provides: **"Limitations of damages—State. [Effective January 1, 1985].**— In any tort action against the state of Rhode Island, or any political subdivision thereof, any damages recovered therein shall not exceed the sum of one hundred thousand dollars ($100,000); provided, however, that in all instances in which the state was engaged in a proprietory [sic] function in the commission of such tort, or in any situation whereby the state has agreed to indemnify the federal government or any agency thereof for any tort liability, the limitation on damages set forth in this section shall not apply."

Prior to January 1, 1985, the statute established a $50,000 ceiling on damages. Public Laws 1974, ch. 39, § 1.

the Legislature's abolition of the doctrine of sovereign immunity.