The **ESTATE OF Paul K. SHERMAN**

v.

**Antonio S. ALMEIDA et al.**

**No. 98–157–Appeal.**

Supreme Court of Rhode Island.

March 22, 2000.

Robert Senville, Rumford, for Plaintiff.

J. Renn Olenn, Warwick, Richard A. Gonnella, Peter A. DiBiase, Mark W. Freel, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## O P I N I O N

GOLDBERG, Justice.

This appeal arose from the criminal activity of former Superior Court Justice Antonio S. Almeida (Almeida), who, while presiding over supplementary proceedings involving a man who was incapacitated and incapable of protecting his own interests, acted in a manner that was corrupt and reprehensible, and represents a dark hour in the history of the Superior Court. A civil action based upon this corrupt conduct and the unscrupulous behavior of other equally nefarious individuals was instituted on February 27, 1992, by the plaintiff, the estate of Paul K. Sherman, against numerous parties, including Almeida in his official capacity as a justice of the Superior Court for the State of Rhode Island.

### Facts and Procedural History

On September 12, 1981, while incarcerated at the Adult Correctional Institutions (ACI) in Cranston, Rhode Island, Paul K. Sherman (Sherman) unsuccessfully attempted to take his own life. Sherman has remained in a persistent vegetative state since that time and has resided at the Morgan Health Care Center in Johnston, Rhode Island, since August 1987. On May 31, 1983, Sherman's mother, Hope Sherman (Ms. Sherman), was appointed guardian ad litem of her son for the purpose of filing and prosecuting a civil action to recover damages for the injuries sustained by Sherman. On June 28, 1983, Ms. Sherman filed a civil action against two ACI correctional officers and the State of Rhode Island, alleging negligence in connection with Sherman's suicide attempt. Thereafter, attorney Thomas Hutton (Hutton) and his law firm were retained by Ms. Sherman in her capacity as guardian ad litem for her son. In 1987, a trial was held before a justice of the Superior Court in

which a jury found for Sherman and assessed damages in the amount of $1,007,-000 [1] against the State of Rhode Island and its agents and employees. That award was thereafter adjusted (pursuant to 1985 R.I. Acts & Resolves 143, § 3) to $595,527.36 to account for medical costs that were owed to the state. Subsequently, Sherman filed a motion for pre-judgment interest, which was denied by the trial justice, who then directed the entry of judgment. Neither party appealed from that judgment, and the order became final on April 22, 1987. However, the General Assembly enacted another private act, 1987 R.I. Acts & Resolves 187, which specifically provided for pre- and post-judgment interest on the jury award.

Thereafter, Almeida was assigned to hear a post-trial motion to determine the gross and net amounts of the proceeds, and to approve an apportionment of recovery between Sherman and his attorney, Hutton. At a private *ex parte* meeting before that hearing, Hutton offered Almeida a bribe in return for a favorable decision that would reverse the previous order that denied interest on the judgment, award pre-judgment interest of approximately $600,000, and approve a fee arrangement whereby 55 percent of the net award plus interest would be paid to the estate of Paul K. Sherman and 45 percent of the gross award would be paid to Hutton. A portion of this exorbitant attorney's fee was to be paid to Almeida as part of the bribe. Thereafter, Almeida fulfilled his part of this corrupt bargain and rendered a series of decisions in which he awarded pre-judgment interest on the judgment and authorized the disbursement of 45 percent of the gross award to Hutton, all the while receiving cash payments that amounted to approximately $18,000. On November 9, 1989, this Court vacated the award of pre-judgment interest and

1. By private act of the General Assembly, 1985 R.I. Acts & Resolves 143, Ms. Sherman was authorized to seek damages from the state and its agents and employees in excess

of the $100,000 limitation for tort liability of the state and its subdivisions embodied in G.L.1956 § 9–31–2.

declared the unappealed April 22, 1987, judgment to be a final judgment not subject to reconsideration, notwithstanding the subsequently enacted private act of the General Assembly. Moreover, we reviewed the attorney's fees approved by Almeida and declared the fee to be unreasonable in light of the provisions of the earlier act of the General Assembly that set forth specific limitations on any recovery that Sherman may have obtained. *See In re Sherman,* 565 A.2d 870, 873 (R.I. 1989).

Unfortunately, the illegal agreement between Hutton and Almeida survived the appeal, and was not unveiled until 1991, when the Morgan Health Care Center attempted to evict Sherman for nonpayment of expenses necessary for his care. At that time, Hutton reported that there was no money left in the estate to pay the expenses and refused to provide an accounting to the Probate Court. Hutton thereafter resigned as co-guardian of the estate. Evidence of embezzlement by Hutton and another lawyer in his law firm was reported to the Attorney General's Office by the Rhode Island Protection and Advocacy System (now the Rhode Island Disability Law Center), which had been referred by the Morgan Health Care Center. Hutton's conduct was also referred to the Supreme Court's chief disciplinary counsel who, after an investigation, filed a petition for the suspension (and ultimate disbarment) of Hutton from the practice of law.

Thereafter, Hutton was interviewed by members of the Attorney General's Office, and in the face of disciplinary hearings, criminal charges, and potential incarceration, he implicated Almeida in the bribery scheme. An agreement was eventually struck between the Attorney General's Office and Hutton in which Hutton agreed to meet with Almeida while wearing a microphone and recording device to record an inculpatory conversation between him and Almeida during which the bribery arrangement was discussed. The contents of that encounter led to the arrest and eventual indictment of Almeida, who, although already retired, was removed from his judicial office, disbarred as an attorney, and saw his judicial pension revoked in its entirety. Almeida eventually pleaded guilty on May 18, 1992, to eight felony counts charged in the indictment, and was sentenced to serve six years in prison.

On February 27, 1992, plaintiff, the estate of Sherman (plaintiff) filed the present action, which is composed of fourteen counts against numerous individuals, including Almeida. Our review is limited to count 3 of the complaint, which alleges that Almeida, in his official capacity as a justice of the Superior Court of the State of Rhode Island, corruptly and maliciously sold justice to Hutton in violation of article 1, section 5, of the Rhode Island Constitution [2] and seeks compensatory, consequential, and punitive damages, as well as attorneys' fees and costs, against Almeida in his official capacity.[3] On December 8,

---

**2.** Article 1, section 5, of the Rhode Island Constitution provides:

"**Entitlement to remedies for injuries and wrongs—Right to justice.**—Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which may be received in one's person, property, or character. Every person ought to obtain right and justice freely, and without purchase, completely and without denial; promptly and without delay; conformably to the laws."

Because our decision today rests solely on the doctrine of judicial immunity, we need not decide whether a judge who has accepted

a bribe in exchange for a favorable decision has "sold justice," thus denying the plaintiff in this case the right "to obtain right and justice freely and without purchase."

**3.** In count 3 and in his brief to this Court, Sherman references a claim for punitive damages against Almeida as an employee of the State of Rhode Island, which is ultimately a claim to recover monetary damages from the state under the doctrine of respondeat superior. However, it is well settled that punitive damages awards against the state are viewed as contrary to public policy. *See Graff v. Motta,* 695 A.2d 486 (R.I.1997). In *Graff,* this Court recognized that "[w]hen the state is

1997, a justice of the Superior Court granted Almeida's motion to dismiss count 3 pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure on the ground that since article 1, section 5, does not by its terms create a private right of action by a litigant against a judge who, in his official capacity, allegedly "sells justice," nor does it provide for the award of monetary damages against Almeida, who is immune from suit under the doctrine of judicial immunity. The plaintiff has appealed.

## Discussion

■ "When ruling on a Rule 12(b)(6) motion, the trial justice must look no further than the complaint, assume that all allegations in the complaint are true, and resolve any doubts in a plaintiff's favor." *Rhode Island Affiliate, American Civil Liberties Union, Inc. v. Bernasconi,* 557 A.2d 1232, 1232 (R.I.1989). "The motion may then only be granted if it 'appears beyond a reasonable doubt that a plaintiff would not be entitled to relief under any conceivable set of facts * * *.'" *Id.* (quoting *City of Warwick v. Aptt,* 497 A.2d 721, 723 (R.I.1985)). When this Court reviews a trial justice's granting of a Rule 12(b)(6) motion, we assume that the allegations contained in the complaint are true, and examine the facts in the light most favorable to the nonmoving party. *Bandoni v. State,* 715 A.2d 580, 582 n. 3 (R.I.1998); *see also St. James Condominium Association v. Lokey,* 676 A.2d 1343, 1346 (R.I. 1996).

Since count 3 alleges that at the time he committed the alleged acts Almeida was acting "in his official capacity as a Justice of the Superior Court of the State of Rhode Island," the trial court was bound to decide the issue under the assumption that when he took the bribe, Almeida was

acting in his official capacity as a justice of the Superior Court. In her decision, the trial justice made that assumption, stating:

"Indeed, [count 3], by its own terms, is plead [*sic*] in the alternative to other counts where plaintiff has sued Defendant Almeida in his individual capacity. The language of Count 3 itself, therefore, confirms that the two preconditions to the application of the doctrine of judicial immunity have been satisfied. On the face of the pleadings alone, therefore, plaintiff's damages claim filed against defendant Almeida in his official capacity is barred by the doctrine of judicial immunity."

Accordingly, based upon the language in count 3, the sole issue for this Court's determination at this time is whether the trial justice erred in finding that the doctrine of judicial immunity barred this action against Almeida in his official capacity. For us to address this issue, we must briefly examine the historical jurisprudence of judicial immunity.

### A. Judicial Immunity

The doctrine of judicial immunity developed at common law as a shield intended to protect judges from civil suits for damages for actions taken in their judicial capacity. *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288, 294 (1967). The doctrine can be traced back to the successful efforts of the King's Bench to ensure the supremacy of the common-law courts. *Pulliam v. Allen,* 466 U.S. 522, 530, 104 S.Ct. 1970, 1974–75, 80 L.Ed.2d 565, 571 (1984) (citing 5 W. Holdsworth, *A History of English Law* 159–60 (3d ed.1945)); *see also* Joseph R. Weisberger, *The Twilight of Judicial Independence—Pulliam v. Allen,* 19 Suffolk U.L.Rev. 537, 537–38 n. 4 (1985) (citing 5 Holdsworth at 429–31). In *Floyd and*

held liable for punitive damages, 'the self-same group who [is] expected to benefit from the public example which the granting of such damages supposedly makes of the wrongdoer' is the group that must bear the burden of punishment, that group comprising

the taxpayers and the citizens of the state or subdivision." *Id.* at 490 (citing *Sharapata v. Town of Islip,* 56 N.Y.2d 332, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (1982) (quoting *Sharapata v. Town of Islip,* 82 A.D.2d 350, 441 N.Y.S.2d 275, 283 (1981))).

*Barker,* 77 Eng. Rep. 1305 (1607), Lord Justice Coke and his colleagues held that the judges of the King's Bench were "immune from prosecution in competing courts for their judicial acts." *Pulliam,* 466 U.S. at 530, 104 S.Ct. at 1975, 80 L.Ed.2d at 572. In doing so, they enunciated the theory upon which the concept of judicial immunity was built:

> "[I]nsomuch as the Judges of the realm have the administration of justice, under the King, to all his subjects, they ought not to be drawn into question for any supposed corruption, which extends to the annihilating of a record, or of any judicial proceedings before them, or tending to the slander of the justice of the King, which will trench to the scandal of the King himself, except it be before the King himself; for they are only to make an account to God and the King, and not to answer to any suggestion in the Star–Chamber." *Id.* at 530–31, 104 S.Ct. at 1975, 80 L.Ed.2d at 572 (quoting *Floyd,* 77 Eng. Rep. at 1307).

The fundamental policy principle underlying the doctrine of judicial immunity was reiterated by the United States Supreme Court in *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646, 649 (1871), where the Court held that "it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." This Court has adopted that reasoning, deciding in *Calhoun v. City of Providence,* 120 R.I. 619, 390 A.2d 350 (1978), that judicial decision-making "must be engaged in * * * freely, independently, and untrammeled by the possibilities of personal liability." *Id.* at 631, 390 A.2d at 356 (citing *Suitor v. Nugent,* 98 R.I. 56, 199 A.2d 722 (1964)). Further, this Court has long recognized that "judicial independence is at the very core of our judicial system, and courts have guarded it jealously." 120 R.I. at 631, 390 A.2d at 356 (citing *Stump v.*

*Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978)). In light of the enormous complexity surrounding the question of judicial immunity, this Court has routinely refused to recognize any attempt to weaken the bulwarks of judicial immunity during the "nearly four hundred years of unbroken adherence to the doctrine." Weisberger, 19 Suffolk U.L.Rev. at 547; *see also Bandoni,* 715 A.2d at 595 ("the concept of judicial * * * immunity remains alive and well").

 Courts have consistently held that judicial immunity is an immunity from suit, not just an immunity from an ultimate assessment of damages. *Mireles v. Waco,* 502 U.S. 9, 11, 112 S.Ct. 286, 288, 116 L.Ed.2d 9, 14 (1991) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). "Accordingly, judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial." *Mireles,* 502 U.S. at 11, 112 S.Ct. at 288, 116 L.Ed.2d at 14 (citing *Pierson,* 386 U.S. at 554, 87 S.Ct. at 1218, 18 L.Ed.2d at 294). Further, in *Pierson,* Chief Justice Warren, speaking for the majority, stated that judicial immunity applies "even when the judge is accused of acting maliciously and corruptly" because it was not established "for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson,* 386 U.S. at 554, 87 S.Ct. at 1218, 18 L.Ed.2d at 294 (quoting *Scott v. Stansfield,* L.R. 3 Ex. 220, 223 (1868)). Although it may be unpalatable at times, particularly where the judge is obviously corrupt, the official conduct of a judge of this state is immune from suit.

### B. Almeida's immunity

 Before this Court, plaintiff argued that it is proper for this Court to modify the long-standing doctrine of judicial im-

munity to permit actions against judges (and therefore their employer, the State of Rhode Island) who are criminally convicted of corruption and bribery for acts undertaken in their judicial capacity. The plaintiff asserted that such a limited exception to the doctrine of judicial immunity that encompasses only those judges convicted of crimes involving corruption and bribery would not interfere with the liberty of judges to exercise their judicial functions with independence and without fear of spurious litigation. We cannot agree with this contention, and are satisfied that were this Court to adopt an exception for judicial acts alleged to be corrupt, the number of complaints by dissatisfied litigants or an unhappy body politic alleging corruption by the judges of this state would increase exponentially, thus requiring an enormous expenditure of limited judicial resources in defense of those unfounded claims.

We agree with the rationale enunciated by Justice Field for exempting judges from exposure to litigation, as derived from the observation of Lord Coke in *Floyd and Barker*, that "if [judges] were required to answer [questions involving alleged corruption], it would 'tend to the scandal and subversion of all justice[, and] those who are the most sincere, would not be free from continual calumniations.'" *Bradley*, 80 U.S. (13 Wall.) at 347–48, 20 L.Ed. at 649–50 (quoting *Floyd*, 77 Eng. Rep. at 1307). Furthermore, we reiterate the sentiment of the hearing justice when granting Almeida's Rule 12(b)(6) motion to dismiss count 3 that,

> "[w]hile it may be appealing superficially to abrogate the doctrine of judicial immunity in this case, [such a course of action] could well give rise to a new category of lawsuits against judges acting in their official capacity that would have to be defended based on allegations of unlawful purchase or sale of justice."

Although we echo the concerns of the trial justice, and stress that this Court in no way condones this appalling criminal conduct by Almeida, a member of the judiciary of this state, we must nonetheless continue to uphold the fundamental bedrock principle that our judicial officers are not liable in suit for actions taken in their judicial capacity.[4]

## Conclusion

For the foregoing reasons, we conclude that there is no possible set of facts in this case that would permeate the barrier of judicial immunity. Therefore, plaintiff's appeal is denied and the judgment of the Superior Court is affirmed. The papers of the case may be remanded to the Superior Court.

---

4. As noted previously, count 3 is one of fourteen claims set forth in the present action by plaintiff. Of those fourteen counts, seven are against Almeida. Included in those seven counts are count 2, which alleges constitutional due process violations by Almeida in his personal capacity; count 8, which alleges the tort of conversion by Almeida in his personal capacity; and count 9, which alleges fraud against Almeida in his personal capacity. Therefore, although we in no way condone Almeida's behavior in this case, it is important to recognize that plaintiff is not without recourse, and may continue to pursue those claims made against Almeida in his personal capacity.