Charles HEALEY, Sr., d/b/a Healey's Shellfish, Plaintiff,

v.

Robert L. BENDICK, Jr., individually and in his capacity as the Director of the Department of Environmental Management, and as Chairperson of the Marine Fisheries Council, Joseph Dawson, Jr., Francis B. Manchester, George Mendosa, Louis Othote, Michael Parascandolo, Dr. Saul Saila, Robert Randall, Robert Smith, individually and as members of the Marine Fisheries Council, and Arlene Violet as Attorney General for the State of Rhode Island, Defendants.

Civ. A. No. 85–0341–S.

United States District Court, D. Rhode Island.

Feb. 12, 1986.

Revens & DeLuca, Ltd., Amato A. DeLuca, Sandra A. Blanding, Providence, R.I., for plaintiff.

Charles C. McKinley, Chief Legal Counsel, R.I. Dept. of Environmental Management, Providence, R.I., for defendants Bendick and Dept. of Environmental Management.

Arlene Violet, Atty. Gen. of R.I., Timothy F. Mullaney, Linda E. Buffardi, Steven Mignano, Sp. Asst. Attys. Gen., Providence, R.I., for defendant Violet, MFC, and Members of MFC.

## OPINION AND ORDER

SELYA, District Judge.

This is a civil action for declaratory and mandatory injunctive relief and for compensatory damages. At bottom, the case presents a direct and robust challenge to the ligitimacy of important elements of Rhode Island's statutory and administrative mechanism for the management and conservation of certain marine resources.

Suit was brought in this court on June 7, 1985 by Charles Healey, Sr. (Healey), as plaintiff, purportedly to redress perceived deprivations of property rights protected by the Due Process Clause of the fifth and fourteenth amendments to the United States Constitution and Article IV, Sections 1 and 2 of the Rhode Island Constitution; to redress alleged impermissible interfer-

ence with interstate commerce in contravention of the Commerce Clause, Art. 1, § 8, of the United States Constitution; to remedy a supposed unreasonable restraint of trade in violation of both the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq., and its state law counterpart, R.I.Gen.Laws § 6–36–1 et seq.; and to assuage the effects of sundry actions allegedly undertaken in breach of state law. The defendants are the director of Rhode Island's department of environmental management (DEM), a division of the executive branch of state government; the state's Marine Fisheries Council (MFC), a governmental entity created by the state legislature, and the individual members of the MFC (including the director of the DEM who, by state law, see R.I.Gen.Laws. § 20–3–1, serves ex officio as MFC's chairman); and the state's attorney general. The members of the MFC have been sued both individually and in their respective official capacities, as has Robert L. Bendick, Jr., the DEM director (Director). The identities of each and all of the members of the MFC are enumerated precisely in the case caption, ante, and it would be pleonastic to list them afresh.

Although pendent state law claims are also asserted, jurisdiction in this court is premised on a federal question theorem. See 28 U.S.C. § 1331.

## I. BACKGROUND

The court presents the facts well pleaded in the complaint in the manner most hospitable to the plaintiff. It appears that Healey, a citizen and resident of Rhode Island, was and is a sole proprietor doing business in Warwick, Rhode Island under the name and style "Healey's Shellfish." As Healey's trade name implies, his business is the sale of shellfish.[1] He purchases product from commercial fishermen who are licensed by the state to take shellfish, and sells at wholesale to buyers located in a variety of places throughout the northeast and the midwest. He also markets shell-

fish at retail from his Warwick headquarters.

Healey contends that the DEM, on August 5, 1984, acting under the authority of the Director, opened the upper Narragansett Bay (Bay) for shellfishing for the first time since December of 1981. (The Bay is the main intercoastal body of water in Rhode Island and is one of the state's primary natural resources.) Healey asserts that, in giving clearance for the extraction of shellfish, the DEM in effect declared that this area of the Bay was no longer polluted, that its condition was satisfactory to permit shellfishing, and that sound conservation policies did not require further abstinence. But, in the plaintiff's view, contamination of a more insidious kind soon infiltrated the troubled waters of the Bay.

At this point, as Healey sees it, the DEM and the MFC became the villains of the piece. Rather than allowing this suddenly pristine portion of the Bay to be shellfished continuously from midsummer of 1984 forward, these defendants placed a series of limitations on access to the Bay and on the hours of fishing. According to the plaintiff, simultaneous with the opening, the DEM and the MFC ordained that it would be accessible for shellfishing only on Tuesday of each week and limited the catch of licensed fishermen to twelve bushels of shellfish apiece. Healey ascribes to the state agencies motives considerably less pure than his assessment of the water quality of the Bay: he attributes these restrictions to an unwholesome (and illegal) desire on the part of these defendants artificially to support the price of shellfish in the local area. And, in the plaintiff's view, these molluscous manipulations were prolonged.

He alleges that on November 1, 1984, the DEM and the MFC collogued once more completely to close the upper portion of Narragansett Bay to shellfishing. When the same part of the Bay was reopened on

---

1. For the benefit of the uninitiated, it should be observed that the Rhode Island General Assembly apparently defines "shellfish" as comprising quahaugs, soft shell clams, sea clams, oysters, mussels, and scallops. E.g., R.I.Gen.Laws § 20–6–1.

April 9, 1985, the DEM and the MFC decreed that this would be only on a limited basis during an initial "trial period" of twenty days in duration. Specifically, the plaintiff alleges that for the first twenty "working days," *i.e.*, the first twenty days from and after April 9 that the grounds were open to shellfishing, such activities were allowed only from 6:00 a.m. to 8:00 a.m.

Healey claims, in a broadly conclusory fashion, that the MFC and the Rhode Island Shellfishermen's Association (a private trade association)[2] conspired hand-in-hand to establish barriers to access to the shellfish beds and that the hours of operation and the intermittent closings were jockeyed to ease the impact of additional shellfish on the market price. He laments the effect of these machinations on the viability of his business, and seeks to put an end to the shell game which he apparently believes has been contrived and practiced by the DEM and the MFC.

It is nowhere alleged that the MFC, in conjunction with the DEM, lacked the authority to undertake the specific actions complained of, viz. opening and closing the Bay and/or imposing limitations on access. Indeed, the defendants' authority to do so under state law can scarcely be questioned. *See* text *post* at Part II. Rather, the gravamen of the plaintiff's jeremiad is that the defendants, jointly and severally, undertook these actions for improper and unlawful reasons.

## II. THE REGULATORY FORMAT

In order to place this litigation into sharp focus, it is necessary to detail the particulars of Rhode Island's regulatory scheme.

MFC is a creature of the state legislature. *See* R.I.Gen.Laws § 20–3–1. The enabling statute was enacted in 1981. The membership of MFC is composed of the Director (who serves ex officio as chairman, *see id.*) or his designee, together with an octet of "private citizen members." *Id.*

These persons must be appointed by the governor (with the advice and consent of the state senate) from "among those [Rhode Islanders] with skill, knowledge and experience in the commercial fishing industry, the sport fishing industry and in the conservation and management of fisheries resources." *Id.*[3]

The sweep of the MFC's authority is wide:

The marine fisheries council shall have regulatory jurisdiction over all marine animal species within the jurisdictional territory of the state. The council is authorized, after the holding of a public hearing to promulgate and adopt rules and regulations governing the following activities only, within the areas of its jurisdiction:

(a) The manner of taking fish, lobsters and shellfish.

(b) The legal size limits of fish, lobsters and shellfish to be taken or possessed.

(c) The seasons and hours during which fish, lobsters and shellfish may be taken or possessed.

(d) The numbers or quantities of fish, lobsters and shellfish which may be taken or possessed.

(e) The opening and closing of areas within the coastal waters to the taking of any and all types of fish, lobsters and shellfish.

R.I.Gen.Laws § 20–3–2.

State law makes it explicit that the MFC, "on the advice of and in cooperation with" the Director, can designate "shellfish or marine life project management areas." R.I.Gen.Laws § 20–3–4. Any such designation shall be "for the purpose of enhancing the cultivation and growth of marine species, managing the harvest of marine species, facilitating the conduct by the department [DEM] of experiments in plant-

---

**2.** Neither the Association nor any of its members are parties to this litigation.

**3.** Under the 1985 amendment to the statute, P.L.1985, ch. 190, § 1, three of the eight public members must be chosen as representatives of the commercial fishing industry, three as representatives of sports fishing, and the remaining two for their expertise either in the conservation and management of fishing resources or in marine biology.

ing, cultivating, propagating, managing and developing any and all kinds of marine life, and any other related purpose." *Id.* Upon identifying such a "management area," the MFC is directed to:

promulgate such rules and regulations as it shall deem necessary for the protection and management of the management area and the animal life and property therein, including the exclusion or restriction of persons from such area or the prohibition of certain activities within such areas or other restrictions as it may deem necessary.

*Id.*

In an emergency situation—and the definition of what constitutes an "emergency" has been left by the Rhode Island General Assembly to the sound discretion of the Council—the MFC's powers are expanded even further:

The Marine Fisheries Council may, without requirement of notice or hearing, close any or all of the coastal waters of the state to the taking of any or all types of fish, lobsters and shellfish, where it determines that a biological emergency exists which imminently threatens the marine resources of the state....

R.I.Gen.Laws § 20-3-5.[4]

In a non-emergency setting, a public hearing is required prior to any closing. *See* R.I.Gen.Laws § 20-3-2, quoted *ante.*

## III. TRAVEL OF THE CASE

Simultaneous with the filing of his complaint, Healey moved for a temporary restraining order, Fed.R.Civ.P. 65(b), designed to insure shellfishermen open access to the disputed portion of the Bay. His motion was heard on June 12, 1985 and denied without prejudice, in part due to the

fact that MFC was in the process of amending the governing regulation in a manner inoffensive to the plaintiff. The matter was further heard on June 27, 1985 and the court again declined to grant interim injunctive relief. By this juncture, the amended regulation (attached hereto as Appendix A) was in full force and effect; it is interesting to note that, although Healey apparently had no problem with it, the rule perpetuates the system of imposition of limitations and restrictions by the MFC. *See id.*

Inasmuch as the defendants had, from the inception of the action, questioned this court's power to grant relief to Healey in the circumstances of this case, merits discovery was stayed sine die. All of the defendants thereafter moved for dismissal under Fed.R.Civ.P. 12(b)(6), and the Director, asserting want of subject matter jurisdiction, filed a kindred motion under Fed.R.Civ.P. 12(b)(1).[5] Amplificative briefing ensued. Oral arguments were heard on December 24, 1985 and the matter was taken under advisement at that time. This rescript constitutes the court's findings and conclusions anent the motions to dismiss.

## IV. THE DISMISSAL STANDARD

This court recently addressed the standard applicable under Fed.R.Civ.P. 12(b)(6) in *Fricker v. Town of Foster,* 596 F.Supp. 1353, 1354 (D.R.I.1984), quoting *Lopez v. Bulova Watch Co.,* 582 F.Supp. 755, 767 (D.R.I.1984):

When considering a motion brought pursuant to Fed.R.Civ.P. 12(b)(6), the court must view all facts and inferences in the light most favorable to the non-moving party. Only if it appears beyond doubt

---

**4.** The provisions of § 20-3-5 are made expressly subject to the terms of R.I.Gen.Laws § 42-35-3(b), a portion of Rhode Island's Administrative Procedures Act which deals generically with agency rulemaking in situations evidencing "imminent peril to the public health, safety or welfare." The § 42-35-3(b) overlay is not at issue in this case.

**5.** Defendant Bendick also moved pursuant to Fed.R.Civ.P. 12(c) for judgment on the plead-

ings. The court declines to entertain this aspect of the motion in light of the resolution of the Fed.R.Civ.P. 12(b)(6) motion. *See* text *post.* Bendick also asserted by motion an ostensible lack of jurisdiction over his person. Fed.R. Civ.P. 12(b)(2). But, because this exhortation was neither briefed nor argued, it is deemed to have been waived. *A & H Manufacturing Co. v. Contempo Card Co.,* 576 F.Supp. 894, 896 n. 1 (D.R.I.1983).

from the pleadings that the party opposing the motion can prove no set of facts which would support the claim for relief may the court grant the motion to dismiss.

The Rule 12(b)(1) benchmark is similar: the court will not dismiss a complaint for want of subject matter jurisdiction unless it appears that there is no colorable basis for the court's jurisdiction. *International Union of Bricklayers and Allied Craftsmen, Local #1 v. Menard & Co. Masonry Building Contractors,* 619 F.Supp. 1457, 1459 (D.R.I.1985); *Fricker,* 596 F.Supp. at 1354.

While the instant motions concoct a bouillabaisse of grounds which the defendants view as dispositive, they necessarily bring before the court all substantial defects in the complaint which are readily apparent from the face of Healey's pleadings. *Black v. Brown University,* 555 F.Supp. 880, 886 (D.R.I.1983); *cf. Literature Inc. v. Quinn,* 482 F.2d 372, 374 (1st Cir.1973).

Mindful of these precepts, the court turns to the contours of the plaintiff's averments.

## V. THE STATEMENTS OF CLAIM

In order properly to test the sufficiency of Healey's case to withstand the instant motions, it is advisable to parse the complaint. The plaintiff limns six statements of claims in as many counts. (In a commendable display of originality, these initiatives are sequentially denominated alphabetically rather than numerically; the court bows to the plaintiff's choice of appellations and adopts these labels for purposes of judicial scrutiny.) The court attempts to capture the essence of each.

1. Count "A" alleges that the applicable Rhode Island law, viz., title 20, chapter 3, which empowered the MFC to open and close the Bay in the manner described above, is so vague and overbroad as to transgress both the federal and state constitutions.

2. Count "B" avers that the defendants, in "arbitrarily and capriciously" opening and closing the Bay, have denied Healey due process and equal protection of the law, in violation of the fifth and fourteenth amendments to the United States Constitution.

3. Count "C" asserts that, in opening and closing the Bay, the defendants have acted ultra vires, that is, outside and in excess of the authority ceded to them by the state's statutory scheme.

4. Count "D" attempts to state a claim under the Commerce Clause, U.S. Const., Art. 1, § 8, averring that the conduct and actions of the defendants, summarized above, constituted an impermissible restraint on interstate commerce.

5. Count "E" alleges that the defendants have intentionally and negligently interferred with interstate commerce and trade by their regulation of the shellfishing industry and through openings and closings of the Bay, in violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq.

6. Count "F" rehashes the preceding statement of claim, but sounds in state law under the Rhode Island Anti-Trust Act, R.I. Gen.Laws. § 6–36–1 et seq.

These varying contentions require, to some extent, disparate treatment by the court. It should be noted at the water's edge that neither the state antitrust or ultra vires assertions (Counts F & C) purport to implicate federal matters. They are purely pendent to the federal questions posited in the other four counts of the complaint. As noted earlier, 28 U.S.C. § 1331 is the sole hook on which jurisdiction is hung. If federal question jurisdiction does not exist, then Counts F and C, a fortiori, are not properly before the court, and need not be dealt with in any substantive way. *E.g., United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.") (footnote omitted); *Clark v. Taylor,* 710

F.2d 4, 11–13 (1st Cir.1983); *Rice v. President & Fellows of Harvard College,* 663 F.2d 336, 339 (1st Cir.1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982); *Massachusetts Universalist Convention v. Hildreth & Rogers Co.,* 183 F.2d 497, 501 (1st Cir.1950) (per curiam); *Strachman v. Palmer,* 177 F.2d 427, 431–33 (1st Cir.1949) (Magruder, C.J., concurring). The same reasoning holds true of that portion of Count A which prays for relief under the safeguards of the Rhode Island Constitution. So, it makes abundant sense to postpone consideration of these claims until all of the federally-oriented causes of action have been examined.

The federal antitrust accusation (Count E) is susceptible to relatively facile disposition on idiocratic grounds. The court thus turns first to that initiative. Thereafter, mindful of the imbricated texture of the remaining federal claims, the thorny array of issues which permeate Counts A, B and D will be addressed. In fulfilling that mission, the court will assess whether or not Rhode Island's statutory mosaic passes federal constitutional muster and will subsequently consider the viability of the charges levelled by the plaintiff against various of the defendants in an assortment of different capacities.

## VI. THE FEDERAL ANTITRUST CLAIM

The sufficiency of Count E of the complaint can be resolved head-on. This is not a hard shell case where allegedly anticompetitive activity was carried out by a private party pursuant to state sanction. *E.g., California Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 99, 100 S.Ct. 937, 940, 63 L.Ed.2d 233 (1980) (private price-fixing arrangement authorized by state).[6] Rather, the plaintiff here challenges the actions of the sovereign itself, as implemented by an arm of the state government.

State action of this kind, molluscivorous or not, carries no federal antitrust implications.

The starting point for any analytic scrutiny in this area must be the Supreme Court's landmark decision in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The *Parker* Court, relying on principles of both federalism and state sovereignty, held squarely:

> We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

*Parker,* 317 U.S. at 350–51, 63 S.Ct. at 313.

Inasmuch as the MFC's edicts were within the sphere of the authority delegated to that body by the Rhode Island General Assembly, the conduct that Healey castigates was undeniably the conduct of the state itself, and therefore immune from Sherman Act charges under the "state action" principle of *Parker. See Hoover v. Ronwin,* 466 U.S. 558, 104 S.Ct. 1989, 1995–98, 80 L.Ed.2d 590 (1984); *Bates v. State Bar of Arizona,* 433 U.S. 350, 360–61, 97 S.Ct. 2691, 2697, 53 L.Ed.2d 810 (1977); *Limeco, Inc. v. Division of Lime of the Mississippi Department of Agriculture & Commerce,* 778 F.2d 1086, 1087 (5th Cir. 1985).

The plaintiff endeavors to deflect the weight of these authorities by casting a wider net. He maintains that Rhode Island, in delegating powers to the MFC, had no intention that such powers be used to

---

**6.** In cases, unlike this one, which involve the anticompetitive behavior of a nonsovereign state representative, the Supreme Court has required, as a condition precedent to exemption from Sherman Act liability, that the defendant's conduct be shown to have been undertaken in pursuance of a "clearly articulated and affirmatively expressed" state policy to substitute regulation for competition. *See, e.g., Community Communications Co. v. City of Boulder,* 455 U.S. 40, 54, 102 S.Ct. 835, 842, 70 L.Ed.2d 810 (1982).

restrain trade, and that, therefore, the "state action" doctrine is inapposite to these facts. But, precisely that argument was lately made to—and rejected by—the Court in *Hoover.* 104 S.Ct. at 1998–2002. The *Hoover* Court expressly abjured any rule which "would allow Sherman Act plaintiffs to look behind the actions of state sovereigns and base their claims on perceived conspiracies to restrain trade among the committees, commissions, or others who necessarily must advise the sovereign." *Hoover,* 104 S.Ct. at 2001. *See also Limeco, Inc., supra.* Once it is recognized that the Sherman Act is not so elastic as to girdle activities undertaken by the state *qua* state, it becomes impertinent for a federal court exercising jurisdiction under the Act to inquire into the manner in which state officials have conducted themselves in the course of those activities. *Cf. Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 128–29, 3 L.Ed. 162 (1810). To hold otherwise "would emasculate the *Parker v. Brown* doctrine." *Hoover,* 104 S.Ct. at 2001.

The Sherman Act serves a salutary purpose in ensuring that the marketplace remain reasonably free and open, and in preventing combinations within the private sector from abridging that fundamental freedom in impermissible ways. But, states themselves have historically been accorded safe harbor in these stormy seas. Congress never intended that the Act be employed to handcuff state governments in the pursuit of their traditional regulatory functions. Both the basic tenets of federalism and the compelling force of precedent require that Healey's Sherman Act claim, which is brought solely against state actors, be dismissed.

7. The proposition is not entirely free from doubt. The plaintiff, unlike a licensed shellfisherman, is not himself directly affected by the statutes. He is free to pursue his business as he sees fit, although his source of supply—and that of every other wholesaler—may be crabbed by the operation of the ordinances. It is remarkably difficult to discern any injury in fact which Healey has suffered as a result of the defend-

## VII. CONSTITUTIONALITY OF THE STATUTORY SCHEME

■ The court next surveys the constitutionality of the state statutory scheme. Whatever denizens of the deep may bar access to a federal forum in a case such as this, it remains clear that state officials may nevertheless be sued in the federal district court to prevent their continued enforcement of state laws which flaunt the guarantees of the federal Constitution. *Green v. Mansour,* — U.S. —, 106 S.Ct. 423, 426–27, 88 L.Ed.2d 371 (1985); *Edelman v. Jordan,* 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974); *Ex parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 453–54, 52 L.Ed. 714 (1908). Indeed, the entertainment of such suits is vital to ensure "the supreme authority of the United States." *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984), quoting *Young,* 209 U.S. at 160, 28 S.Ct. at 454. A state's espousal of sovereign immunity may be entitled to substantial deference in many quarters, but it cannot thereby insulate conduct which abridges federal constitutional guarantees. *See, e.g., Martinez v. California,* 444 U.S. 277, 284 n. 8, 100 S.Ct. 553, 558 n. 8, 62 L.Ed.2d 481 (1980).

The plaintiff has attacked the constitutionality of the statutory paradigm on a variety of fronts. In approaching this interleaved set of questions, the court assumes for the sake of argument that Healey has standing to raise the constitutional contentions.[7] But, these challenges, severally or in the ensemble, may, in the metier of the mollusk world, be put to bed with considerable celerity.

### A. *Commerce Clause*

The Commerce Clause, Art. 1, § 8 of the United States Constitution, declares that

ants' conduct which can fairly be traced to the operation of the state statutes. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Munoz-Mendoza v. Pierce,* 711 F.2d 421, 424–25 (1st Cir.1983).

"Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, ...". This imperative has an impact beyond its immediate language, for "the Clause has long been recognized as a self-executing limitation on the power of the States to enact ... laws imposing substantial burdens on [interstate] commerce." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984).

In order to divine whether a state statute has run afoul of this monition, the Court has sculpted a tripartite test:

[W]e must inquire (1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.

*Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).

■ It is plain that, even when legislating "in areas of legitimate local concern, such as environmental protection and resource conservation, states are nonetheless limited by the Commerce Clause." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471, 101 S.Ct. 715, 727, 66 L.Ed.2d 659 (1981). The devoir of persuasion rests, at least initially, with the party who attempts to invalidate the statute. *Hughes*, 441 U.S. at 336, 99 S.Ct. at 1736. It is only if discrimination against interstate commerce is shown that any burden falls on the state to justify the enactment under the latter two parts of the *Hughes* trichotomy. *Id.; see also Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977).

■ The plaintiff falls far short of meeting the *Hughes* criteria. The Rhode Island statutes and the ensuing MFC orders do not discriminate on their face against interstate commerce; rather, to the extent that commerce is affected at all, the regulatory paradigm burdens interstate and intrastate commerce alike in an evenhanded, non-differentiating manner. For a time, no one was permitted to extract shellfish from the designated management area, whether for consumption and/or sale in Rhode Island or elsewhere. During additional periods, extraction was limited as to hours and as to quantities, again irrespective of the interstate/intrastate character of the eventual use of the harvest. (Healey does not challenge in this proceeding the quantitative differential between deracination of shellfish by licensed non-residents as opposed to residents, *see* Appendix A; in any event, this distinction has no bearing on *commercial* extraction.)

It is clear that Rhode Island enjoys the right to regulate and control activity within her territorial waters, at least in the absence of conflicting federal legislation (and the plaintiff here has pointed out none such). *Alaska v. Arctic Maid*, 366 U.S. 199, 203, 81 S.Ct. 929, 931, 6 L.Ed.2d 227 (1961); *Skiriotes v. Florida*, 313 U.S. 69, 75, 61 S.Ct. 924, 928, 85 L.Ed. 1193 (1941). Facially neutral state legislation of this sort does not do violence to the imperatives of the Commerce Clause. *E.g., Toomer v. Witsell*, 334 U.S. 385, 394–95, 68 S.Ct. 1156, 1161–62, 92 L.Ed. 1460 (1948) (upholding South Carolina statutes regulating commercial shrimp fishing as against a Commerce Clause challenge). Even when read most favorably to the plaintiff, the factual allegations of the complaint amount to no more than a doleful lamentation that state regulation has burdened Healey's business, not that it has unduly favored intrastate commerce over interstate commerce. There are no averments as to the quantity or percentage of shellfish in designated management areas as opposed to other (unregulated) shellfishing grounds within the state's domain; there are no averments from which the impact of Rhode Island's regulations upon the national market can rationally be measured; no facts are pleaded which tend to reveal that the state has impermissibly preferred in-state industry to

out-of-state industry. There is, in brief, an utter absence of any fact-intensive predicate sufficient to show, or even to intimate, that the practical impact of Rhode Island's regulatory thrust has placed an undue or disparate overload on the normal flow of interstate commerce. That Healey's style may have been cramped is, in and of itself, beside the point. The Commerce Clause has never been read to forbid a state from making any regulation which in any way affects the operation of commercial enterprises.

In sum, the effect (if any) of the legislation on commerce across state lines is so marginal, indirect, attenuated, and slight as to be barely discernible. Such an effect is clearly "incidental"—and therefore, permissible—within the *Hughes* framework. In point of fact, Healey's able counsel fail, in their otherwise exegetic brief, to cite a single analogous case which supports their Commerce Clause asservation. And, the court's independent research has revealed none.

The plaintiff's Commerce Clause challenge is woven of the gossamer strands of whimsy, conjecture, hyperbole, and surmise. The Rhode Island statutes neither overtax nor meaningfully impose upon interstate commerce. For this reason, the Commerce Clause claim is bogus and the court need not reach the remaining prongs of the *Hughes* test. It is well to note, nonetheless, that the state's regulatory tessellation patently serves legitimate—indeed, vital—local purpose, *cf. Toomer*, 334 U.S. at 393, 68 S.Ct. at 1160–61 ("the state has sufficient interests in the shrimp fishery within three miles of its coast so that it may exercise its police power to protect and regulate that fishery") (footnote omitted), and the plaintiff has wholly failed to identify any banausic alternative means by which these important interests could as effectively be promoted.

### B. *Vagueness*

The plaintiff's second constitutional foray comprises a polemic that the statutory/regulatory mosaic is unduly vague, and therefore runs afoul of the commands of the Due Process Clause. The Supreme Court has repeatedly recognized that "[v]ague laws offend ... important values." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). The plaintiff's chief complaint in this regard is that the statute ceding power to the MFC, R.I.Gen.Laws § 20–3–2, is "essentially standardless," and that the statute vesting responsibility in the Director, R.I.Gen.Laws § 20–1–2, reproduced in the margin,[8] is equally bereft of standards. This peccant bickering need not long detain the court.

The fourteenth amendment provides that no state "shall deprive any person of life, liberty, or property, without due process of law." As this court has noted:

> An unconstitutionally vague statute is one compelling a person of average intelligence to guess and to resort to conjecture as to its meaning and/or as to its supposedly mandated application.

*United Nuclear Corp. v. Cannon*, 553 F.Supp. 1220, 1233 (D.R.I.1982). *See also Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926); *Precious Metals Associates, Inc. v. Commodity Futures Trading Comm'n.*, 620 F.2d 900, 906–07 (1st Cir. 1980).

While this rule was, in the first instance, applied solely in the criminal context, *see Collins v. Kentucky*, 234 U.S. 634, 638, 34 S.Ct. 924, 925, 58 L.Ed. 1510 (1914), it has subsequently been extended to civil statutes. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S.Ct. 1186, 1192–93, 71 L.Ed.2d 362 (1982); *Broadrick v. Oklahoma*, 413 U.S. 601, 607–08, 93 S.Ct. 2908,

---

**8.** R.I.Gen.Laws § 20–1–2 provides in its entirety as follows:

> The General Assembly hereby vests in the Director of the Department of Environmental Management authority and responsibility over the fish and wildlife of the State and, together with the Marine Fisheries Council as hereinafter set forth, over the fish, lobsters, shellfish and other biological resources of marine waters of the State.

2913, 37 L.Ed.2d 830 (1970). The test is a flexible one; "an economic regulation ordinarily will be scrutinized under a lower-magnification microscope than a criminal statute." *United Nuclear,* 553 F.Supp. at 1233, citing *Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. at 1193.

■ The enactments which Healey objurgates contain no amphibolous language; there is no need to speculate as to what those laws mean and signify. To the extent that they are somewhat general in their scope, any infirmity is cured by the express grant of rulemaking authority in each instance. Section 20–3–2 contains an internalized authorization to the MFC "to promulgate and adopt rules and regulations" governing the activities placed within its jurisdiction; § 20–1–2 must be read in conjunction with R.I.Gen.Laws § 20–8.1–2, which grants to the Director, upon approval of the state Environmental Standards Board, the right to issue regulations anent the taking of shellfish. In addition, as to the statute's grant of power to the MFC enabling it to open and close selected portions of Narragansett Bay, the statute is, in the Nixonian term, perfectly clear. The power is express, *see* R.I.Gen.Laws. § 20–3–2(e), and is to be exercised for specifically delineated purposes. *See* R.I.Gen.Laws § 20–3–4. There is no significant uncertainty: what Healey visualizes as the misty reaches of the Bermuda Triangle are in reality well-charted waters.

To succeed on his vagueness argument, Healey must demonstrate that the law is "impermissibly vague in *all* of its applications." *Hoffman Estates,* 455 U.S. at 497, 102 S.Ct. at 1192–93 (emphasis added). That is far from the case here. In the reflected light of this rather detailed statutory scheme, neither Healey nor anyone of average intelligence can legitimately claim that the MFC, or the Director, or both, have unbridled and ambiguous authority bereft of procedural standards or substantive definitions such as would make it necessary to guess at the law's mandated and intended application vis-a-vis restriction of access to the Bay. That being so, it is plain that the plaintiff has not made the requisite showing to support a charge of facial invalidity. Accordingly, under the teaching of *Hoffman Estates,* the court need not address the issue of whether the laws might be unconstitutionally vague in some conceivable application.

Although perhaps supererogatory in view of the foregoing, the plaintiff's imprecation is further undermined in another way. The courts have been consentient in holding that any vagueness argument must fall on deaf ears if the affected party can, in fact, rationally be expected to clarify the meaning of the disputed law or regulation by self-inquiry or by resort to an administrative process. *See Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. at 1193; *Joseph E. Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 49, 86 S.Ct. 1254, 1263, 16 L.Ed.2d 336 (1966). It would be absurd to hear complaints of professed confusion from one possessing the ability and the means readily to comprehend. There is, in this context, no valid reason why the law should help those who refuse to help themselves. In this instance, the statutory rubric specifically memorializes a public hearing mechanism, the gears of which are engaged before the implementation of any rules and regulations governing the opening and closing of shellfish areas. R.I.Gen.Laws § 20–3–2. A person or firm predisposed to inquire as to the meaning, effect, or purpose of a proposed rule or regulation has ample opportunity to do so, and ample recourse thereafter under the state's Administrative Procedures Act. *See* R.I.Gen.Laws §§ 42–35–1—42–35–18. The availability of such a prevenient anodyne sucks whatever little wind remains out of Healey's vagueness sails.

In undertaking a vagueness analysis, a court has a duty to give effect, if possible, to a state statute. *See Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975); *United States v. New England Coal & Coke Co.,* 318 F.2d 138, 142 (1st Cir.1963). That principle can be determinative in a close case. But, in respect to Healey's claim that the law is

not sufficiently distinct, this canon does not come into play. The clarity of the statutory scheme, the lack of any perceptible indefiniteness, and the easy prophylaxis which the Rhode Island General Assembly has built into the enactment combine to reduce Healey's assertion of impermissible vagueness to the merest of vellieties. There is no pearl within this particular oyster.

## C. Miscellaneous Constitutional Grievances

### 1. Overbreadth.

The plaintiff, in his brief and at oral argument alike, has invoked the overbreadth doctrine as a part of his constitutional armamentarium, but he has entirely failed to load any ammunition into the weapons of his campaign. The court is at a loss to fathom the manner in which Healey claims that the legislation is overly sweeping. War whoops alone will not suffice. Be that as it may, the court's "first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." Hoffman Estates, 455 U.S. at 494, 102 S.Ct. at 1191 (footnote omitted). If it does not intrude into such precincts, then the overbreadth challenge is necessarily foredoomed. Id.

■ In this case, the state has not directly infringed upon any property interest of the plaintiff; indeed, Rhode Island did not purport, by this enactment, to ban or otherwise directly to regulate Healey's conduct of his business. The plaintiff points to no right or claim of entitlement to an endless supply of shellfish from Rhode Island waters; he has revealed the existence of no interest rooted in state law, in a well-established understanding with the state, or in a course of conduct which arguably limited the discretion of state officials in the premises. At best, Healey had a mere unilateral expectancy of purchasing a more abundant harvest. Such a naked expectation does not rise to the level of a constitutionally protected property interest. See Board of

Regents v. Roth, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972); cf. Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981).

■ On its face, the statute represents an exercise of state authority in matters of resource conservation wholly within Rhode Island's police power. Inasmuch as the enactment does not impair or even reach any "substantial amount of constitutionally protected conduct," Hoffman Estates, 455 U.S. at 494, 102 S.Ct. at 1191, the overbreadth contention is jejune.

### 2. Equal Protection

■ Healey's equal protection asservation, raised in Count B of the complaint, has been neither briefed nor argued. It is, therefore, deemed to have been waived. A & H Manufacturing Co., 576 F.Supp. at 896 n. 1. See n. 5, ante.

One gratuitous observation, however, should be made. There is nothing in the record to support a constitutional challenge of this sort. The statutory scheme at issue treats Healey no differently than any other wholesaler of edible mollusks. The regulations promulgated thereunder, whether or not supportable in other respects, wholly fail to implicate the Equal Protection Clause. This ill-conceived averment was, it seems, sensibly abandoned.

### 3. Recapitulation.

In summary, then, title 20, chapter 3, of the Rhode Island General Laws completes its voyage around the reefs and shoals of the plaintiff's federal constitutional seascape without incident.

## VIII. REPRESENTATIVE CAPACITY CLAIMS

The plaintiff, in a blunderbuss assault on the conduct of the defendants (other than the attorney general),[9] has sued each in a

---

9. Arlene Violet, as the state's attorney general, is not alleged to have had any personal or official involvement in the matters of which Healey

complains. She is sued purely in her role as the state's chief legal officer in order to permit the plaintiff to test the constitutionality of the statu-

dual capacity, i.e., as a state official and as an individual. In examining these bifurcated claims, the court will first consider the remaining (nonpendent) contentions of the plaintiff insofar as they implicate the defendants in their official capacities.

The principal thrust to the defense motions in this regard is that Healey's claims are barred by the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Despite the limited language of the amendment, the immunity it provides to the states was extended at an early date to suits brought by a citizen against his or her own state, *Hans v. Louisiana,* 134 U.S. 1, 5–6, 10 S.Ct. 504, 505, 33 L.Ed. 842 (1890), on the reasoning that the Eleventh Amendment exemplified the broader doctrine of sovereign immunity of the states, and that such immunity placed a constitutional limitation on the federal judicial power established in Article III of the federal Constitution. *Pennhurst,* 465 U.S. at 98, 104 S.Ct. at 906–07; *Edelman,* 415 U.S. at 662–63, 94 S.Ct. at 1355.

The Eleventh Amendment confirms "that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III." *Pennhurst,* 465 U.S. at 98, 104 S.Ct. at 906–07. Because of the force of this limitation, states may not be sued in federal court unless they consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, expresses its intent to abrogate the immunity in definite terms. *Id.* at 99, 104 S.Ct. at 907. *See also Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694, 697 (1st Cir.1983). It has long been recognized that the relinquishment of Eleventh Amendment rights may never lightly be inferred. *E.g., Petty v. Tennessee-Missouri Bridge Commission,* 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959).

In the case at bar, there is no question as to the presence or absence of a congressional mandate: there has been none. Thus, the force of the plaintiff's asseveration that the Eleventh Amendment does not bar his way depends, in the initial instance, on whether the state has surrendered its constitutional protection.

It is clear that Rhode Island has waived its sovereign immunity in respect to tort actions. *See* R.I.Gen.Laws § 9–31–1.[10] But, the claims which Healey asserts against these defendants do not sound in tort. The conduct of which the plaintiff complains is uniquely that of a governmental body, and cannot in any way be considered tortious in nature. A private person could neither commit, nor be sued in an action *ex delicto* for, the type and kind of

---

tory scheme. *See, e.g., Griffin v. Bendick,* 463 A.2d 1340, 1344 (R.I.1983) (interpreting R.I.Gen. Laws § 9–30–11 to require presence of Attorney General as an indispensable party in actions challenging the constitutionality of state statutes).

**10.** Generally, it is not clear that the enactment of a statute such as § 9–31–1 would constitute a waiver of a state's Eleventh Amendment immunity. *See Atascadero State Hospital and California Department of Mental Health v. Scanlon,* 53 U.S.L.W. 4985, 4987 (U.S. Aug. 6, 1985) ("in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court*") (emphasis original). But, the Rhode Island Supreme Court has interpreted R.I.Gen.Laws § 9–31–1 to provide such a waiver for suits in tort against the state in federal court. *See Laird v. Chrysler Corp.,* 460 A.2d 425, 430 (R.I.1983) ("[T]he broad language of this section, which unambiguously and without restriction holds the state 'liable in all actions of tort in the same manner as a private individual or corporation' ... manifests, by 'overwhelming implication,' a legislative intent to place the state in the same position as any other private litigant and thus amenable to suit in either state or federal court.") (citing R.I.Gen.Laws § 9–31–1). *Accord Marrapese v. State of R.I.,* 500 F.Supp. 1207, 1222 (D.R.I.1980). The First Circuit has recently deferred to the state supreme court's cryptanalysis of this Rhode Island statute, see *Della Grotta v. State of R.I.,* 781 F.2d 343 (1st Cir. 1986), and has upheld the sufficiency of § 9–31–1 as a waiver of Rhode Island's Eleventh Amendment immunity in tort actions.

activities which Healey attributes to these defendants. *See Allendale Leasing, Inc. v. Stone*, 614 F.Supp. 1440, 1451 (D.R.I. 1985). *See also Gamble v. Florida Department of Health and Rehabilitative Services*, 779 F.2d 1509 (11th Cir.1986). (Fla.Stat.Ann. § 768.28, authorizing recovery of tort damages against the state or any of its agencies or subdivisions, "represented only a limited abrogation of Florida's immunity; the waiver is limited to traditional torts"). It stretches imagination well past the breaking point to theorize that R.I.Gen.Laws § 9–31–1 was intended to surrender the state's traditional immunity with respect to such behavior. As Judge Pettine of this court recently observed: "[T]he Rhode Island legislature did not intend, through the enactment of its Tort Claims Act, to subject the State to liability for the discretionary and administrative acts of its … officials." *Allendale Leasing*, 614 F.Supp. at 1451. *See also Gamble, supra; Rhode Island Affiliate, American Civil Liberties Union v. Rhode Island Lottery Commission*, 553 F.Supp. 752, 766 n. 9 (D.R.I.1982). Indeed the state supreme court—to which *Della Grotta* demands that substantial deference be paid in this area, *see* n. 10 *ante*—has held that, notwithstanding the presence of § 9–31–1, the state's immunity to suit is alive and well in contexts analogous to that currently at bar:

> In suits brought against the state, plaintiffs must show a breach of some duty owed to them in their individual capacities and not merely a breach of some obligation owed the general public.

*Ryan v. State of Rhode Island, Department of Transportation*, 420 A.2d 841, 843 (R.I.1980).

R.I.Gen.Laws § 9–31–1 has not breached the sovereign immunity dike as massively. as Healey would prefer to believe. The true extent of the sea change was much more modest, and does not reach acts and omissions of the sort which the plaintiff here impugns. And, the plaintiff has tendered no other evidence of a constitutionally sufficient waiver. Inasmuch as Rhode Island has not distinctly specified an inten-

tion to relinquish its Eleventh Amendment shield in circumstances akin to those at bar, the state must in this suit derive the full measure of the protection which is due to it under the federal Constitution.

■ The present action, insofar as it is brought against the defendants in their official capacities as members of the MFC and as Director of the DEM, respectively, is effectively an action against the state. In the albedo of the analysis undertaken above, it would be wholly barred by the Eleventh Amendment but for the seminal decision of *Ex Parte Young*, 209 U.S. at 123, 28 S.Ct. at 441. As noted, the theory of *Young* was that an unconstitutional statute is void, *id.* at 159, 28 S.Ct. at 453–54, and therefore does not "import to [the official] any immunity from responsibility to the supreme authority of the United States." *Id.* at 160, 28 S.Ct. at 454. The *Young* exception is, however, of no solace to Healey; the court has already determined that the state statute in question easily withstands the federal constitutional challenge which the plaintiff has mounted. *See* text *ante* at Part VII. So, Healey cannot detour around the Eleventh Amendment barrier by resort to the by-ways of *Young*. Short of constitutional deficiencies or some other conflict with federal law (and none is apparent here), injunctive relief simply will not lie in this venue. The Court has flatly barred any intervention by a federal court to conform state officials' conduct to the rigors of a state statute on purely state law grounds. *Pennhurst*, 465 U.S. at 120–21, 104 S.Ct. at 919.

This action, insofar as it seeks to impose liability on the defendants in their official capacities, in reality seeks to impose liability on the state itself. The Eleventh Amendment to the federal Constitution stands squarely in the way. Rhode Island has not forfeited that protection with respect to the discretionary administrative acts and omissions of the state's departments, commissions, boards, or the officials thereof, acting in their representative ca-

pacities. The plaintiff's initiative must therefore fail.

## IX. INDIVIDUAL CAPACITY CLAIMS

The Eleventh Amendment does not bar actions for money damages arising from constitutional violations committed by state officials who are then sued in their individual capacities in federal courts. Such actions, which seek to impose personal liability on the individual defendants, are not considered to be actions against the state. *Kentucky v. Graham*, —— U.S. ——, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Scheuer v. Rhodes*, 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974). In a nutshell, Healey's argument on this fascicle of his case is that, irrespective of the constitutionality vel non of the state statute, the state actors involved nonetheless acted ultra vires of their designated powers and thereby violated the plaintiff's federally-secured constitutional rights.

The issue remains, however, as to the type of relief (if any) that would be appropriate in such an "individual capacity" action. The complaint, on this score, contains prayers for both injunctive and monetary redress. Each of these prayers requires a separate analysis.

### A. *Injunctive Relief*

■ The reason that the operation of the Eleventh Amendment is neutered in an individual capacity action stems from the concept that, inasmuch as the suit is against an individual, it is not against the state. Yet, form cannot be allowed to triumph over substance. The general rule is that relief sought nominally against an officer of the state is in fact against the sovereign if the decree would operate against the latter. *Pennhurst*, 465 U.S. at 101, 104 S.Ct. at 908; *Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 1053, 10 L.Ed.2d 191 (1963) (per curiam). "Operation" in this context has been construed to include any relief that would "[e]xpend itself on the public treasury or domain, or interfere with the public administration," *Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947), or if the

effect of the judgment would be to "restrain the government from acting, or compel it to act." *Larson v. Domestic and Foreign Corp.*, 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949). *See generally Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). Application of this principle swiftly draws the grease from Healey's goose.

■ In the circumstances of this case, there can be no legitimate doubt that any injunctive relief emanating from this court would of necessity "restrain the government from acting," that is, from opening and closing shellfish beds in accordance with the state's statutory scheme. To this extent, therefore, the plaintiff's claims for injunctive relief are actually claims against the state, howsoever styled. The addition of a desultory phrase in the caption of a case cannot stem the inexorable flow of the sovereign immunity tide; whether or not the plaintiff can reasonably be viewed as seeking relief from the state is a matter not of semantics, but of substance. A wolf with an appetite to shackle the operation of state government is none the less lupine when garbed in the sheep's clothing of an "individual capacity" action. Thus, insofar as these claims seek equitable relief, they are foreclosed by the Eleventh Amendment for the reasons previously stated. *See* text *ante* at Part VIII.

### B. *Money Damages*

■ The forays which seek monetary relief against the defendants in their individual capacities must, however, be viewed through a different glass. These claims bear no necessary relationship to the public fisc and do not directly interfere with public administration or with the state's command of its own destiny. Thus, *Gordon* and its progeny do not preclude the maintenance of such actions. *Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697, 102 S.Ct. 3304, 3321, 73 L.Ed.2d 1057 (1982). But, notwithstanding the inapplicability of the Eleventh Amendment in these precincts, Healey's path is far from unobstructed.

### 1. *Legislative Immunity*

██ National, state and regional legislators have absolute federal common law immunity from liability for damages occasioned by their legislative acts. *Tenney v. Brandhove,* 341 U.S. 367, 376–78, 71 S.Ct. 783, 788–89, 95 L.Ed. 1019 (1951) (absolute immunity for state legislators). This amnesty is by no means limited to elected representatives; it applies to all who serve on behalf of a state government (or the federal government) in a legislative capacity. *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 404–06, 99 S.Ct. 1171, 1178–79, 59 L.Ed.2d 401 (1979) (absolute immunity for appointed members of bi-state regional land planning agency acting in legislative capacity); *cf. Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 734–37, 100 S.Ct. 1967, 1975–77, 64 L.Ed.2d 641 (1980) (justices acting in legislative capacity have absolute immunity from injunctive and declaratory relief as well as from damages).

██ The breadth of federal common law immunities is limited to the extent that effective brakes on official conduct are negated by it. Government by caprice cannot be allowed. In the traditional sense, the electorate has direct control over legislators, so negation of checks and balances is not in issue. But, the fact that the MFC is an unelected body does not mean that its membership is estranged by law from the tranquil waters of legislative immunity. Absolute legislative immunity does not depend "on any particular set of state rules or procedures available to discipline erring legislators." *Lake Country Estates,* 440 U.S. at 404, 99 S.Ct. at 1178–79. What is dispositive instead is whether there are effective checks on unconstitutional conduct, whatever particular form those safeguards might take. *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 613 (8th Cir.1980).

██ Whether or not the members of the MFC are covered by this blanket immunity is dependent in the first instance upon the due characterization of their functions and activities: they enjoy the exemption if, and to the extent that, they act as a legislative body; they are beyond its pale if, and to the extent that, they perform executive functions. There is no specific yardstick to apply to the MFC to measure the appropriateness of considering it to be a legislative body. The Court has noted that the person or entity involved must be "acting in the sphere of legitimate legislative activity," *Tenney,* 341 U.S. at 376, 71 S.Ct. at 788, if he or it is to enjoy the prophylaxis of the rule. One must employ a functional analysis, outlining the traditional duties attributable to the three distinct branches of government and aligning the party claiming the privilege to the appropriate branch. A party loses the absolute legislative privilege, for example, if it is "[o]bvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive." *Id.* at 378, 71 S.Ct. at 789. The court thus turns to the particularized taxonomy which the caselaw demands.

The MFC's raison d'etre, its sole mission, is to formulate policies anent marine animal species. R.I.Gen.Laws § 20–3–2. In turn, the Council is empowered to adopt rules and regulations concerning a quintet of defined activities, all of which relate to the taking of "fish, lobsters and shellfish." *Id.* The MFC's authority to engage in rulemaking relative to the "opening and closing" of, inter alia, shellfish beds, *id.* at (e), is coupled with an interlocking power to designate "shellfish or marine life project management areas," R.I.Gen.Laws § 20–3–4, and to indulge in the promulgation of such further rules as it may deem essential "for the protection and management of the management area and the animal life and property therein." *Id.* In the ordinary course, this suzerainty is exercisable only after the holding of a public hearing. R.I. Gen.Laws § 20–3–2. *But see* n. 4 *ante* and accompanying text.

Though the sweep of the MFC's rulemaking jurisdiction is great, it is not linked to any enforcement powers or other executive responsibilities. The Council must rely entirely upon the DEM to execute regulations ordained by the MFC and to ensure compliance therewith. In addition, the MFC en-

joys no statutory leave to engage in any of the numerous activities commonly associated with the executive branch. It has no mechanism under its control for the enforcement of its pronouncements; it has no right to enter contracts; it has no ability to raise revenues for its own operation; it has no army of troops in the field to monitor compliance with its rules. The MFC, in short, possesses none of the incidents of an executive body.

The MFC is similarly bereft of any of the telltale indicia of the judicial branch. It does not hear and determine disputes on a final and binding basis; it cannot itself restrain or punish for contempt those who ignore its rules. Adjudication is entirely alien to the Council's stated mode of operation.

These factors point ineluctably to a conclusion that the members of the MFC act in an essentially legislative capacity. And, there is nothing in the calculus of checks and balances which forestalls this result. That balance is, here, weighted precisely the same as in *Lake Country Estates, supra,* where the Court held the members of an appointed bi-state planning authority to be absolutely immune, as a matter of federal common law, from damages liability in a federal forum arising out of actions undertaken by them in a legislative capacity. 440 U.S. at 405, 99 S.Ct. at 1179. To the extent (if at all) that a fuller explication of this topic may still be required in the afterglow of *Lake Country Estates,* it may be noted that an assortment of checks and balances are present in respect to the Council: the statutes from which its authority is derived are enacted by elected legislators (indeed, it is those assemblymen who have expressly delegated the rulemaking power to the MFC); the state legislators are accountable, in turn, to the electorate. So is the governor, who has named the members of the Council. *See* R.I.Gen.Laws. The councilmen have relatively short (four year) terms, *id.,* and are

themselves subject to the vagaries of the reappointment process. The mixed composition of the Council, required by state law, *see* n. 3 *ante,* is itself a valuable safeguard. Declaratory and injunctive relief are available in the state courts, and the state's administrative review mechanism is applicable. *See* text *ante* at Part VII(B). In the case of willful deprivation of federal constitutional rights under color of state law, the federal court can act on the criminal side under 18 U.S.C. § 242. *See United States v. Gillock,* 445 U.S. 360, 372, 100 S.Ct. 1185, 1193, 63 L.Ed.2d 454 (1980) (official immunity cases have drawn the line at civil actions; criminal offenses are not insulated). By any reasoned standard, this array of checks and balances is ample.

It is clear beyond cavil that the MFC has only legislative fish to fry, and that there is no warrant in the circumstances of this case to deprive the members of the Council of the protections attendant thereto under federal common law. To all intents and purposes, the MFC is purely a legislative entity—no more, no less.[11] As surely as night follows day, it follows that the Council must be deemed to be a legislative arm of the state government. Its members, like clams luxuriant at high tide, perforce enjoy the absolute immunity from suit conferred upon those who perform essentially legislative acts.

To be sure, the plaintiff in this case argues that the members of the MFC acted with ulterior motives, implying that any cloak of legislative protection has thereby been discarded. But, the weight of authority runs to the contrary. Judicial inquiry into any such potential motivation is effectively precluded. *Tenney,* 314 U.S. at 377, 71 S.Ct. at 788–89; *cf. Barr v. Matteo,* 360 U.S. 564, 571–75, 79 S.Ct. 1335, 1339–41, 3 L.Ed.2d 1434 (1959) (absolute immunity available to federal officials cannot be defeated by proof of deliberate malice as long as their conduct falls within the outermost frontiers of their line of duty). As this

---

11. "There is a fair amount of truth in the barnyard aphorism: if it walks like a duck, and squawks like a duck, it must be a duck." *Car-* *roll v. Capalbo,* 563 F.Supp. 1053, 1058 (D.R.I. 1983).

court has remarked, the judiciary in a variety of contexts, must often "eschew[ ] the speculation necessarily inherent in trying to divine hidden motives of public officials," instead focussing "on the objective attributes of an act or practice itself." *Fausto v. Diamond,* 589 F.Supp. 451, 461 (D.R.I.1984). *See also Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 508, 95 S.Ct. 1813, 1824, 44 L.Ed.2d 324 (1975) (motives of those covered by Speech or Debate Clause of the United States Constitution irrelevant); *United States v. O'Brien,* 391 U.S. 367, 384, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672 *reh'g denied,* 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968) (same); *Fletcher v. Peck,* 6 Cranch at 130, 10 U.S. at 130 (court cannot inquire into motives of state legislators in voting to enact contested statute). To be sure, the consistent application of concepts of absolute immunity may allow some excesses of official power to go unredressed, but that is a necessary (and justifiable) price to pay for the effective performance of legislative responsibilities uninhibited by fear of personal liability. Even assuming an improper animus on the part of one or all of the members of the MFC, therefore, absolute legislative immunity remains intact. It is the character of the functions performed, not the nisus or state of mind of the performers, which governs. Here, as in other absolute immunity precincts, "the [allegedly] malicious nature of the conduct is, for purposes of immunity analysis, irrelevant." *Ricci v. Key Bancshares of Maine, Inc.,* 768 F.2d 456, 462 (1st Cir.1985).

### 2. Qualified (Executive) Immunity

▮ Although the members of the MFC, including its chair, are absolutely immune from liability for money damages to the extent of their legislative activity, the analysis must continue as to the defendant Bendick. He, in essence, wears two hats: the plaintiff has sued him *both* in his "legislative" role as chairman of the MFC and his "executive" role as Director of the DEM. What has been said above, *see* text *ante* at Part IX(B)(1), shields Bendick from liability only in the first of these incarnations. His second set of headgear must yet be scrutinized. Yet, although the frame of reference is different, the result is the same: Bendick is equally immune from damages for actions undertaken as Director of the DEM.

*In Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court reformulated the criteria attending the qualified immunity of government officials.[12] Under the *Harlow* test, government officials are sheltered from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. The critical question must, therefore, be phrased in objective terms. As the Court has most recently noted, whether or not an officer should prevail on his qualified immunity defense "depends upon the 'objective reasonableness of [his] conduct as measured by reference to clearly established law.' No other 'circumstanc-

**12.** Immunity of this genre is an affirmative defense which must be pleaded by an official named as a defendant. *See Harlow,* 457 U.S. at 815, 102 S.Ct. at 2736–37; *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980). The plaintiff rails that Bendick lacks standing to assert the defense "because he has failed to plead such immunity as an affirmative defense in his answer to Plaintiff's complaint." Plaintiff's Brief at 8. This ipse dixit misstates the record. In the fourth defense limned in Bendick's answer, he claimed the benefit of all privileges and immunities inuring to him as a result of his status as a public official. (Nowhere in the Federal Rules is it required that an affirmative defense be labelled as such.) Although less than meticulously precise, this reference was sufficient to put the point in issue. Fed.R.Civ.P. 8(c) mandates that when responding "to a preceding pleading, a party shall set forth affirmatively ... any ... matter constituting an avoidance or affirmative defense." As this court has noted: "The fundamental purpose of Rule 8(c) is to avoid litigation by ambush. A defendant must fairly apprise the plaintiff of special, nonroutine defenses which it seeks to assert." *Odence v. Salmonson Ventures,* 108 F.R.D. 163, 166 (D.R.I. 1985). Under this standard, the Director's fourth defense was adequate to hoist the qualified immunity shield.

es' are relevant to the issue of qualified immunity." *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984) (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). The objective standard is designed to stop frivolous suits in their tracks by permitting, nay requiring, summary disposition in deserving cases. *Id.* *See generally Krohn v. United States,* 742 F.2d 24, 27–29 (1st Cir.1984).

The First Circuit has had an opportunity to expound upon and to apply the *Harlow* rubric in *Floyd v. Farrell,* 765 F.2d 1 (1st Cir.1985). In determining whether or not a police officer enjoyed qualified immunity from liability arising out of an arrest, the court of appeals held that it was required to make an objective analysis of the reasonableness of the officer's conduct in light of those facts actually known to him. *Id.* at 6. His subjective assessment of the facts was thought to be immaterial; the police officer's actual motives for his behavior were not to be considered. *Id.*

An application of these principles to the matter at bar totally undercuts the remaining claims against the Director. Bendick, in his capacity as chief of the DEM, had a clear legal obligation to "enforce such rules, regulations, and orders as may be necessary to carry out the duties assigned to the director and the department by any provision of law ..." R.I.Gen.Laws § 42–17.1–2(S). Under a parallel state statute, he was required to execute the rules and regulations promulgated by the MFC, R.I. Gen.Laws § 20–3–4, and to implement and enforce the MFC's "designation" of certain portions of the Bay as marine management areas. *Id.* His actions in closing the parts of the Bay specified by the MFC were clearly mandated by a state law which was not itself constitutionally infirm or patently invalid. *See* text *ante* at Part VII. Viewed in the context of his proper duties, the objective reasonableness of the Director's acts cannot seriously be questioned.

The plaintiff does not allege that the Director unilaterally undertook actions in respect to the shellfish beds beyond those necessary to fulfill his statutory obligations to consult with the MFC and to implement its edicts. (Though Healey denigrates Bendick's motives and plainly considers his counsel to the MFC to have been either iniquitous or biased, or both, this court cannot inquire into such subjective considerations. *Floyd,* 765 F.2d at 6.) The plaintiff points to no particular conduct on this defendant's part which, objectively viewed, could be held to have abridged any of Healey's settled constitutional or statutory rights. In such circumstances, the objective reasonableness of the Director's acts becomes a given. So long as what Bendick did was lawful, what prompted him to do it is of no moment. Basing the suitability vel non of Bendick's conduct solely upon reference to clearly established law, as required in *Davis,* 104 S.Ct. at 3018, he is entitled to the anodyne of qualified executive immunity and is thereby held harmless from a damages action.

In fine, neither injunctive nor monetary relief may result from Healey's federal claims against any or all of the defendants in their respective individual capacities. These initiatives, like the plaintiff's other federal claims, sink of their own weight. They are insufficient to withstand the force of the defendants' dismissal motions.[13]

---

13. The finding that each and all of the named defendants, individually, are immunized against Healey's suit may well fortify the conclusion reached by the court on other grounds to the effect that the state's sovereign immunity is intact, *see* text *ante* at Part VIII, notwithstanding the existence of R.I.Gen.Laws § 9–31–1. Even when tort liability is charged, the Rhode Island Supreme Court views the outer limits of the statutory waiver as abutting the line at which some official immunity referable to the particu-lar state actor takes hold. *See Calhoun v. City of Providence,* 120 R.I. 619, 390 A.2d 350, 357 (1978) (plaintiff's claim against the state barred if the state official responsible for the action "personally enjoyed the protection of a governmental immunity from tort liability"). The *Calhoun* court did not differentiate among the various species of immunity available to state officials, but embraced all personal government immunity protections within the announced rule. *Id.,* 390 A.2d at 356–57 & n. 5.

## X. CONCLUSION

The court has examined the principal arguments advanced by the plaintiff, and has found each of them to be wanting. (To the extent that Healey has adverted to points not reviewed herein, they are uniformly meritless and do not warrant extended discussion.) The molluscan morsels which Healey has served up are unfit for federal court consumption.

The defendants, and each of them, are exempt from federal antitrust liability. The plaintiff's seriatim challenges to the Rhode Island statutory scheme, and to the acts and omissions of the defendants thereunder, are ineffectual under the United States Constitution. The Eleventh Amendment and the Court's holding in *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. at 902 (1984) coalesce to bar federal claims against the defendants in their representative capacities. And, the combination of these same factors with the doctrines of legislative immunity and qualified good faith executive immunity join forces to bid farewell to the plaintiff's federal question claims against the defendants individually.

Healey has set a series of traps in the turbulent seas patrolled by the MFC and the DEM, but his catch has proven to be undersized. The defendants' motions to dismiss each and all of the plaintiff's federal claims must be, and they hereby are, granted.

As to Healey's state law claims, *e.g.,* (i) putative transgressions of rights secured to him by the Rhode Island Constitution, (ii) actions allegedly undertaken ultra vires and/or in excess of the authority ceded to the defendants by state law, (iii) ostensible violations of the state antitrust act, this court cannot, under the rule of *Gibbs,* 383 U.S. at 726, retain jurisdiction. *See* text *ante* at Part V and cases collected therein. In any event, pendent jurisdiction in this instance would be barred by the Eleventh Amendment. *See Pennhurst,* 465 U.S. at 120, 104 S.Ct. at 919 ("The Eleventh Amendment should not be construed to apply with less force to [pendent jurisdiction]

than it does to the explicitly granted power to hear federal claims."). Accordingly, Healey's state law claims must be, and hereby are, dismissed without prejudice for want of federal subject matter jurisdiction. The court expresses no opinion as to the merit (or lack thereof) of any of these state law contentions.

This court does not shrug off the grave charges which Healey has levelled against the MFC and the DEM; to the extent (if at all) that his fears are rooted in fact, they deserve to be investigated in some depth. Conservation and the management of natural resources are matters of considerable importance to Rhode Island's future, and the process by which these goals are assured must be, like Caesar's wife, beyond reproach. But, the plaintiff has brought his suspicions to the wrong forum. The only cognizable questions which he arguably raises are questions of state law, and fundamental principles of comity and federalism dictate that, in the circumstances of this case, those inquiries be resolved in a state tribunal.

There is no warrant here for allowing the nose of the federal camel to intrude into the state's tent. The plaintiff's ill-conceived attempt to force the square pegs of his ultra vires and improper motivation claims against state officials into the round holes of federal jurisdiction stands conventional jurisprudence on its head. That resupinate effort must be rejected.

The clerk is directed forthwith to enter judgment for the defendants for costs.

*It is so ordered.*

## APPENDIX A

*Upper Narragansett Bay Shellfish Management Area.*

For the purpose of protecting and propagating shellfish populations, there is hereby established a management area in Upper Narragansett Bay in the City of Warwick and Town of Barrington, which is bordered on the South by a line running from the Rocky Point Dock in Warwick in a northeasterly direction to the end of Holly

Lane in Barrington, and on the North by a line running from Conimicut Point in Warwick to Conimicut Light, thence to Nayatt Point in Barrington.

1. Shellfish harvesting in the Upper Narragansett Bay Shellfish Management Area shall be allowed only when declared open by the Division of Water Resources to shellfish harvesting based upon water quality considerations and in accordance with Section 20–8.1 of the General Laws of Rhode Island. During such periods, shellfish harvest shall be permitted between the hours of 6:00 AM and 8:00 AM on Mondays through Fridays for a cumulative total of twenty "working days" as defined below.

2. For the purpose of this regulation a "working day" shall be defined as a day of the week and between and including Monday through Friday when the so-called "Upper Narragansett Bay" is declared open for shellfish harvesting based upon water quality considerations and in accordance with Section 20–8.1 of the General Laws of Rhode Island.

3. Following the period of twenty cumulative "working days" as herein defined, or on June 17, 1985, the Upper Narragansett Shellfish Management Area shall be opened to shellfish harvesting thenceforth for seven days per week between sunrise and sunset unless declared closed for water quality considerations and in accordance with Chapter 20–8.1 of the General Laws of Rhode Island.

4. Daily catch limits in the area shall be the standard statewide catch limits for quahaugs, soft shell clams, mussels, and oysters as specified in RIGL 20–6–1 (Part 4.03).

MAXIMUM DAILY TAKE

| Rhode Island Resident | ½ bu./day/each/per person |
| Commercial License Holders | 12 bu./day/each/per person |
| Licensed non-resident | 1 peck/day/each |